Ralph **GINGLES, Sippio Burton, Fred Belfield, and Joseph Moody, on Behalf of Themselves and All Others Similarly Situated, Plaintiffs,**

**Alan V. Pugh, Gregory T. Griffin, Mason McCullough, Paul B. Eaglin, Ethel R. Trotter, Gilbert Lee Boger, David D. Almond, Jr., Ray Warren, Joe B. Roberts, Plaintiff-Intervenors,**

v.

**Rufus EDMISTEN, in his capacity as the Attorney General of N.C.; James C. Green, Lt. Governor of N.C. in His Capacity as President of the N.C. Senate; Liston B. Ramsey in His Capacity as Speaker of the N.C. House of Reps.; The State Board of Elections of N.C.; Robert W. Spearman, Elloree M. Erwin, Ruth T. Semashko, William A. Marsh, Jr., and John A. Walker, in Their Official Capacities as Members of the State Board of Elections of N.C.; and Thad Eure, in His Capacity as Secretary of the State of N.C., Defendants.**

No. 81–803–CIV–5.

United States District Court,
E.D. North Carolina,
Raleigh Division.

Jan. 27, 1984.

Supplemental Opinion April 20, 1984.

Leslie J. Winner, Chambers, Ferguson, Watt, Wallas & Adkins, Charlotte, N.C., Robert N. Hunter, Jr., Greensboro, N.C., Jack Greenberg, James M. Nabrit, III, Lani Guinier, New York City, for plaintiffs.

James Wallace, Jr., Deputy Atty. Gen. for Legal Affairs, Rufus L. Edmisten, N.C. Atty. Gen., Raleigh, N.C., for defendants.

Before PHILLIPS, Circuit Judge, BRITT, Chief District Judge, and DUPREE, Senior District Judge.

## MEMORANDUM OPINION

JAMES DICKSON PHILLIPS, Circuit Judge:

In this action Ralph Gingles and others, individually and as representatives of a class composed of all the black citizens of North Carolina who are registered to vote, challenge on constitutional and statutory grounds the redistricting [1] plan enacted in final form in 1982 by the General Assembly of North Carolina for the election of members of the Senate and House of Representatives of that state's bicameral legislature. Jurisdiction of this three-judge district court is based on 28 U.S.C. §§ 1331, 1343, and 2284 (three judge court) and on 42 U.S.C. § 1973c.

The gravamen of plaintiffs' claim is that the plan makes use of multi-member districts with substantial white voting majorities in some areas of the state in which there are sufficient concentrations of black voters to form majority black single-member districts, and that in another area of the state the plan fractures into separate voting minorities a comparable concentration of black voters, all in a manner that violates rights of the plaintiffs secured by section 2 of the Voting Rights Act of 1965, amended June 29, 1982, 42 U.S.C. § 1973 (Section 2, or Section 2 of the Voting Rights Act), 42 U.S.C. §§ 1981 and 1983, and the thirteenth, fourteenth and fifteenth amendments to the United States Constitution.[2] In particular, the claim is that the General Assembly's plan impermissibly dilutes the voting strength of the state's registered black voters by submerging black voting minorities in multi-member House District No. 36 (8 members—Mecklenburg County), multi-member House District No. 39 (5 members—part of Forsyth County), multi-member House District No. 23 (3 members—Durham County), multi—member House District No. 21 (6 members—Wake County), multi-member House

---

1. For consistency and convenience we use the term "redistricting" throughout as a more technically, as well as descriptively, accurate one than the terms "apportionment" or "reapportionment" sometimes used by the parties herein to refer to the specific legislative action under challenge here. *See Carstens v. Lamm*, 543 F.Supp. 68, 72 n. 3 (D.Col.1982).

2. The original complaint also included challenges to population deviations in the redistricting plan allegedly violative of one-person-one-vote principles, and to congressional redistricting plans being contemporaneously enacted by the state's General Assembly. Both of these challenges were dropped by amended or supplemental pleadings responsive to the evolving course of legislative action, leaving only the state legislature "vote dilution" claims for resolution.

District No. 8 (4 members—Wilson, Edgecombe and Nash Counties), and multi-member Senate District No. 22 (4 members—Mecklenburg and Cabarrus Counties), and by fracturing between more than one senate district in the northeastern section of the state a concentration of black voters sufficient in numbers and contiguity to constitute a voting majority in at least one single-member district, with the consequence, as intended, that in none of the senate districts into which the concentration is fractured (most notably, Senate District 2 with the largest mass of the concentration) is there an effective voting majority of black citizens.

We conclude on the basis of our factual findings that the redistricting plan violates Section 2 of the Voting Rights Act in all the respects challenged, and that plaintiffs are therefore entitled to appropriate relief, including an order enjoining defendants from conducting elections under the extant plan. Because we uphold plaintiffs' claim for relief under Section 2 of the Voting Rights Act, we do not address their other statutory and constitutional claims seeking the same relief.

## I

### General Background and Procedural History

In July of 1981, responding to its legal obligation to make any redistrictings compelled by the 1980 decenniel census, the North Carolina General Assembly enacted a legislative redistricting plan for the state's House of Representatives and Senate. This original 1981 plan used a combination of multi-member and single-member districts across the state, with multi-member districts predominating; had no district in which blacks constituted a registered voter majority and only one with a black population majority; and had a range of maximum population deviations from the equal protection ideal of more than 20%. Each of the districts was composed of one or more whole counties, a result then mandated by state constitutional provisions adopted in 1968 by amendments that pro-

hibited the division of counties in legislative districting. At the time this original redistricting plan was enacted (and at all critical times in this litigation) forty of North Carolina's one hundred counties were covered by section 5 of the Voting Rights Act of 1965, 42 U.S.C. § 1973c (Section 5, or Section 5 of the Voting Rights Act).

Plaintiffs filed this action on September 16, 1981, challenging that original redistricting plan for, *inter alia,* its population deviations, its submergence of black voter concentrations in some of the multi-member districts, and the failure of the state to obtain preclearance, pursuant to Section 5, of the 1968 constitutional amendments prohibiting county division in legislative districting.

After this action had been filed, the state submitted the 1968 no-division-of-counties constitutional provisions for original Section 5 preclearance by the Attorney General of the United States. While action on that submission was pending, the General Assembly convened again in special session and in October 1981 repealed the original districting plan for the state House of Representatives and enacted another. This new plan reduced the range of maximum population deviations to approximately 16%, retained a preponderance of multi-member districts across the state, and again divided no counties. No revision of the extant Senate districting plan was made.

In November 1981, the Attorney General interposed formal objection, under Section 5, to the no-division-of-counties constitutional provisions so far as they affected covered counties. Objection was based on the Attorney General's expressed view that the use of whole counties in legislative districting required the use of large multi-member districts and that this "necessarily submerges cognizable minority population concentrations into larger white electorates." Following this objection to the constitutional provisions, the Attorney General further objected, on December 7, 1981, and January 20, 1982, to the then extant redis-

tricting plans for both the Senate and House as they affected covered counties.

In February 1982, the General Assembly again convened in extra session and on February 11, 1982, enacted for both the Senate and House revised redistricting plans which divided some counties both in areas covered and areas not covered by Section 5. Again, on April 19, 1982, the Attorney General interposed objections to the revised districting plans for both the Senate and House. The letter interposing objection acknowledged some improvement of black voters' situation by reason of county division in Section 5 covered areas, but found the improvements insufficient to permit preclearance. The General Assembly once more reconvened in a second extra session on April 26, 1982, and on April 27, 1982, enacted a further revised plan which again divided counties both in areas covered and areas not covered by Section 5. That plan, embodied in chapters 1 and 2 of the North Carolina Session Laws of the Second Extra Session of 1982, received Section 5 preclearance on April 30, 1982. As precleared under Section 5, that plan constitutes the extant legislative districting law of the state, and is the subject of plaintiffs' ultimate challenge by amended and supplemented complaint in this action.[3]

During the course of the legislative proceedings above summarized, this action proceeded through its pre-trial stages.[4] Amended and supplemental pleadings accommodating to successive revisions of the originally challenged redistricting plan were allowed. Extensive discovery and motion practice was had; extensive stipula-

tions of fact were made and embodied in pretrial orders. The presently composed three-judge court was designated by Chief Judge Harrison L. Winter of the United States Court of Appeals for the Fourth Circuit on October 16, 1981. The action was designated a plaintiff class action by stipulation of the parties on April 2, 1982. Following enactment and Section 5 preclearance of the April 27, 1982, Senate and House districting plans, the pleadings were closed, with issue joined for trial on plaintiffs' challenge, by amended and supplemented complaint, to that finally adopted plan.

Following a final pre-trial conference on July 14, 1983, trial to the three-judge court was held from July 25, 1983, through August 3, 1983. Extensive oral and documentary evidence was received. Decision was deferred pending the submission by both parties of proposed findings of fact and conclusions of law, briefing and oral argument. Concluding oral arguments of counsel were heard by the court on October 14, 1983, and a limited submission of supplemental documentary evidence by both parties was permitted on December 5, 1983.

Having considered the evidence, the memoranda of law submitted by the parties, the stipulations of fact, and the oral arguments of counsel, the court, pursuant to Fed.R.Civ.P. 52(a), enters the following findings of fact and conclusions of law, prefaced with a discussion of amended Section 2 of the Voting Rights Act and of certain special problems concerning the proper interpretation and application of that section to the evidence in this case.

---

**3.** The final plan's division of counties in areas of the state not covered by Section 5 was challenged by voters in one such county on the basis that the division violated the state's 1968 constitutional prohibition. The claim was that in noncovered counties of the state the constitutional prohibition remained in force, notwithstanding its suspension in covered counties by virtue of the Attorney General's objection. In *Cavanagh v. Brock*, 577 F.Supp. 176 (E.D.N.C. 1983), which at one time was consolidated with the instant action, this court rejected that challenge, holding that as a matter of state law the constitutional provisions were not severable, so that their effective partial suspension under fed-

eral law resulted in their complete suspension throughout the state.

**4.** At one stage in these proceedings another action challenging the redistricting plan for impermissible dilution of the voting strength of black voters was consolidated with the instant action. In *Pugh v. Hunt*, No. 81–1066–CIV–5, also decided this day, we earlier entered an order of deconsolidation and permitted the black plaintiffs in that action to intervene as individual and representative plaintiffs in the instant action.

## II

### *Amended Section 2 of the Voting Rights Act*

■ From the outset of this action·plaintiffs have based their claim of racial vote dilution not only on the fourteenth and fifteenth amendments, but on Section 2 of the Voting Rights Act. As interpreted by the Supreme Court at the time this action was commenced, former Section 2,[5] secured no further voting rights than were directly secured by those constitutional provisions. To the extent "vote dilution" claims lay under either of the constitutional provisions or Section 2,[6] the requirements for proving such a claim were the same: there must have been proven both a discriminatorily "dilutive" effect traceable in some measure to a challenged electoral mechanism and, behind that effect, a specific intent on the part of responsible state officials that the mechanism should have had the effect. *City of Mobile v. Bolden,* 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980).

While this action was pending for trial and after the ultimately challenged redistricting plan had been enacted and given Section 5 preclearance, Congress amended Section 2[7] in drastic and, for this litigation, critically important respects. In rough summary, the amended version liberalized the statutory vote dilution claim in two fundamental ways. It removed any necessity that discriminatory intent be proven, leaving only the necessity to show dilutive effect traceable to a challenged electoral mechanism; and it made explicit that the dilutive effect might be found in the "totality of the circumstances" within which the challenged mechanism operated and not alone in direct operation of the mechanism.

Following Section 2's amendment, plaintiffs amended their complaint in this action to invoke directly the much more favorable provisions of the amended statute. All further proceedings in the case have been conducted on our perception that the vote dilution claim would succeed or fail under amended Section 2 as now the obviously most favorable basis of claim.[8]

Because of the amended statute's profound reworking of applicable law and because of the absence of any authoritative

5. Former Section 2, enacted pursuant to Congress's constitutional enforcement powers, provided simply:

No voting qualification or prerequisite to voting, or standard, practice, or procedure shall be imposed or applied by any State or political subdivision to deny or abridge the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in Section 1973b(f)(2) of this title.

42 U.S.C. § 1973 (1976).

6. It is·not now perfectly clear—but neither is it of direct consequence here—whether a majority of the Supreme Court considers that a racial vote dilution claim, as well as a direct vote denial claim, lies under the fifteenth amendment and, in consequence, lay under former Section 2. *See Rogers v. Lodge,* 458 U.S. 613, 619 n. 6, 102 S.Ct. 3272, 3276 n. 6, 73 L.Ed.2d 1012 (1982). It is well settled, however, that such claims lie under the fourteenth amendment, though only upon proof of intent as well as effect. *See City of Mobile v. Bolden,* 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980).

7. H.R. 3112, amending Section 2 and extending the Voting Rights Act of 1965, was passed by the House on October 15, 1981. On June 18, 1982,

the Senate adopted a different version, S. 1992, reported out of its Committee on the Judiciary. The House unanimously adopted the Senate bill on June 23, 1982, and it was signed into law by the President on June 29, 1982. There was no intervening conference committee action.

8. Of course, the direct claims under the fourteenth (and possibly the fifteenth) amendment remain, and could be established under *Bolden* by proof of a dilutive effect intentionally inflicted. But no authoritative decision has suggested that proof *alone* of an unrealized discriminatory intent to dilute would suffice. A dilutive effect remains an essential element of constitutional as well as Section 2 claims. *See* Hartman, *Racial Vote Dilution and Separation of Powers: An Exploration of the Conflict Between the Judicial "Intent" and the Legislative "Results" Standards,* 50 Geo.W.L.Rev. 689, 737–38 n. 318 (1982). Neither is there any suggestion that the remedy for an unconstitutional intentional dilution should be any more favorable than the remedy for a Section 2 "result" violation. Whether evidence of discriminatory intent might nevertheless have limited relevance in establishing a Section 2 "results" claim is another matter.

Supreme Court decisions interpreting it,[9] we preface our findings and conclusions with a summary discussion of the amended statute and of our understanding of its proper application to the evidence in this case. Because we find it dispositive of the vote dilution claim, we may properly rest decision on the amended statute alone and thereby avoid addressing the still subsisting constitutional claims seeking the same relief. *See Ashwander v. Tennessee Valley Authority,* 297 U.S. 288, 347, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring).

Section 2, as amended, reads as follows:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in Section 4(f)(2), as provided in subsection (b).

(b) A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a)

in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided,* That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

Without attempting here a detailed analysis of the legislative history leading to enactment of amended Section 2, we deduce from that history and from the judicial sources upon which Congress expressly relied in formulating the statute's text the following salient points which have guided our application of the statute to the facts we have found.

*First.* The fundamental purpose of the amendment to Section 2 was to remove intent as a necessary element of racial vote dilution claims brought under the statute.[10]

This was accomplished by codifying in the amended statute the racial vote dilution principles applied by the Supreme Court in its pre-*Bolden* decision in *White v. Regester,* 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973). That decision, as assumed by the Congress,[11] required no more to estab-

---

**9.** There have, however, been a few lower federal court decisions interpreting and applying amended Section 2 to state and local electoral plans. All generally support the interpretation we give the statute in ensuing discussion. *See Major v. Treen,* 574 F.Supp. 325 (E.D.La.1983) (three-judge court); *Rybicki v. State Board of Elections,* 574 F.Supp. 1147 (N.D.Ill.1983) (three-judge court); *Thomasville Branch of NAACP v. Thomas County,* Civil Action No. 75–34–THOM (M.D.Ga. Jan. 26, 1983); *Jones v. City of Lubbock,* Civil Action No. CA–5–76–34 (N.D.Tex. Jan. 20, 1983); *Taylor v. Haywood County,* 544 F.Supp. 1122 (W.D.Tenn.1982) (on grant of preliminary injunction).

**10.** Senator Dole, sponsor of the compromise Senate version ultimately enacted as Section 2, stated that one of his "key objectives" in offering it was to

make it unequivocally clear that plaintiffs may base a violation of Section 2 on a showing of discriminatory "results", in which case proof of discriminatory intent or purpose would be neither required, nor relevant. I was convinced of the inappropriateness of an "intent standard" as the sole means of establishing a voting rights claim, as were the majority of my colleagues on the Committee. S.Rep. No. 417, 97th Cong., 2d Sess. 193 (1982) U.S.Code Cong. & Admin.News 1982 p. 177 (additional views of Sen. Dole) (hereinafter S.Rep. No. 97–417).

**11.** Congressional opponents of amended Section 2 contended in debate that *White v. Regester* did not actually apply a "results only" test, but that, properly interpreted, it required, and by implication found, intent also proven. The right or wrong of that debate is essentially beside the point for our purposes. We seek only Congres-

lish the illegality of a state's electoral mechanism than proof that its "result," irrespective of intent, when assessed in "the totality of circumstances" was "to cancel out or minimize the voting strength of racial groups," *id.* at 765, 93 S.Ct. at 2339—in that case by submerging racial minority voter concentrations in state multi-member legislative districts. The *White v. Regester* racial vote dilution principles, as assumed by the Congress, were made explicit in new subsection (b) of Section 2 in the provision that such a "result," hence a violation of secured voting rights, could be established by proof "based on the totality of circumstances ... that the political processes leading to nomination or election ... are not equally open to participation" by members of protected minorities. *Cf. id.* at 766, 93 S.Ct. at 2339.

■ *Second.* In determining whether, "based on the totality of circumstances," a state's electoral mechanism does so "result" in racial vote dilution, the Congress intended that courts should look to the interaction of the challenged mechanism with those historical, social and political factors generally suggested as probative of dilution in *White v. Regester* and subsequently elaborated by the former Fifth Circuit in *Zimmer v. McKeithen,* 485 F.2d 1297 (5th Cir.1973) (en banc), *aff'd on other grounds sub nom. East Carroll Parish School Board v. Marshall,* 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976) (per curiam). These typically include, per the Senate Report accompanying the compromise version enacted as amended Section 2:

1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

2. the extent to which voting in the elections of the state or political subdivision is racially polarized;

3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6. whether political campaigns have been characterized by overt or subtle racial appeals;

7. the extent to which members of the minority group have been elected to public office in the jurisdiction.

Additional factors that in some cases have had probative value as part of plaintiffs' evidence to establish a violation are:

whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group.

whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.

While these enumerated factors will often be the most relevant ones, in some cases other factors will be indicative of the alleged dilution.

S.Rep. No. 97–417, *supra* note 10, at 28–29, U.S.Code Cong. & Admin.News 1982, pp. 206–207 (footnotes omitted).

*Third.* Congress also intended that amended Section 2 should be interpreted and applied in conformity with the general

sional intent, which clearly was to adopt a "results only" standard by codifying a decision unmistakably assumed—whether or not errone-

ously—to have embodied that standard. *See* Hartman, *Racial Vote Dilution, supra* note 8, at 725–26 & n. 236.

body of pre-*Bolden* racial vote dilution jurisprudence that applied the *White v. Regester* test for the existence of a dilutive "result." [12]

Critical in that body of jurisprudence are the following principles that we consider embodied in the statute.

■ The essence of racial vote dilution in the *White v. Regester* sense is this: that primarily because of the interaction of substantial and persistent racial polarization in voting patterns (racial bloc voting) with a challenged electoral mechanism, a racial minority with distinctive group interests that are capable of aid or amelioration by government is effectively denied the political power to further those interests that numbers alone would presumptively, *see United Jewish Organizations v. Carey,* 430 U.S. 144, 166 n. 24, 97 S.Ct. 996, 1010 n. 24, 51 L.Ed.2d 229 (1977), give it in a voting constituency not racially polarized in its voting behavior. *See Nevett v. Sides,* 571 F.2d 209, 223 & n. 16 (5th Cir.1978). Vote dilution in this sense can exist notwithstanding the relative absence of structural barriers to exercise of the electoral franchise. It can be enhanced by other factors —cultural, political, social, economic—in which the racial minority is relatively disadvantaged and which further operate to diminish practical political effectiveness. *Zimmer v. McKeithen, supra.* But the demonstrable unwillingness of substantial numbers of the racial majority to vote for any minority race candidate or any candidate identified with minority race interests is the linchpin of vote dilution by districting. *Nevett v. Sides, supra; see also Rogers v. Lodge,* 458 U.S. 613, 623, 102 S.Ct. 3272, 3278, 73 L.Ed.2d 1012 (1981) (empha-

sizing centrality of bloc voting as evidence of purposeful discrimination).

■ The mere fact that blacks constitute a voting or population minority in a multi-member district does not alone establish that vote dilution has resulted from the districting plan. *See Zimmer,* 485 F.2d at 1304 ("axiomatic" that at-large and multi-member districts are not *per se* unconstitutional). Nor does the fact that blacks have not been elected under a challenged districting plan in numbers proportional to their percentage of the population. *Id.* at 1305.[13]

■ On the other hand, proof that blacks constitute a population majority in an electoral district does not *per se* establish that no vote dilution results from the districting plan, at least where the blacks are a registered voter minority. *Id.* at 1303. Nor does proof that in a challenged district blacks have recently been elected to office. *Id.* at 1307.

Vote dilution in the *White v. Regester* sense may result from the fracturing into several single-member districts as well as from the submergence in one multi-member district of black voter concentrations sufficient, if not "fractured" or "submerged," to constitute an effective single-member district voting majority. *See Nevett v. Sides,* 571 F.2d 209, 219 (5th Cir. 1978).

■ *Fourth.* Amended Section 2 embodies a congressional purpose to remove all vestiges of minority race vote dilution perpetuated on or after the amendment's effective date by state or local electoral mechanisms.[14] To accomplish this, Con-

---

**12.** *See* S.Rep. No. 97–417, *supra* note 10, at 32 ("[T]he legislative intent [is] to incorporate *[White v. Regester]* and extensive case law ... which developed around it."). *See also id.* at 19–23 (*Bolden* characterized as "a marked departure from [the] prior law" of vote dilution as applied in *White v. Regester, Zimmer v. McKeithen,* and a number of other cited federal decisions following *White v. Regester* ).

**13.** This we consider to be the limit of the intended meaning of the disclaimer in amended Section 2 that "nothing in this section establishes a

right to have members of a protected class elected in numbers equal to their proportion in the population." 42 U.S.C. § 1973.

**14.** Both the Senate and House Committee Reports assert a purpose to forestall further purposeful discrimination that might evade remedy under the stringent intent-plus-effects test of *Bolden* and to eradicate existing or new mechanisms that perpetuate the effects of past discrimination. *See* S.Rep. 97–417, *supra* note 10, at 40; H.R.Rep. No. 227, 97th Cong., 1st Sess. 31 (1981) (hereinafter H.R.Rep. No. 97–227).

gress has exercised its enforcement powers under section 5 of the fourteenth and section 2 of the fifteenth amendments [15] to create a new judicial remedy by private action that is broader in scope than were existing private rights of action for constitutional violations of minority race voting rights. Specifically, this remedy is designed to provide a means for bringing states and local governments into compliance with constitutional guarantees of equal voting rights for racial minorities without the necessity to prove an intentional violation of those rights.[16]

*Fifth.* In enacting amended Section 2, Congress made a deliberate political judgment that the time had come to apply the statute's remedial measures to *present conditions* of racial vote dilution that might be established in particular litigation; that national policy respecting minority voting rights could no longer await the securing of those rights by normal political processes, or by voluntary action of state and local governments, or by judicial reme-

dies limited to proof of intentional racial discrimination. *See, e.g.*, S.Rep. 97–417, *supra* note 10, at 193 (additional views of Senator Dole) (asserting purpose to eradicate "racial discrimination which ... still exists in the American electoral process").

In making that political judgment, Congress necessarily took into account and rejected as unfounded, or assumed as outweighed, several risks to fundamental political values that opponents of the amendment urged in committee deliberations and floor debate. Among these were the risk that the judicial remedy might actually be at odds with the judgment of significant elements in the racial minority; [17] the risk that creating "safe" black-majority single-member districts would perpetuate racial ghettos and racial polarization in voting behavior; [18] the risk that reliance upon the judicial remedy would supplant the normal, more healthy processes of acquiring political power by registration, voting and coalition building; [19] and the fundamental risk

We accept—and it is not challenged in this action by the state defendants—that Congress intended the amendment to apply to litigation pending upon its effective date. *See Major v. Treen, supra*, at 341–42 n. 20.

**15.** Both the Senate and House Committee Reports express an intention that amended Section 2 be regarded as remedial rather than merely redefinitional of existing constitutional voting rights. *See* S.Rep. No. 97–417, *supra* note 10, at 39–43; H.R.Rep. No. 97–227, *supra* note 14, at 31.

**16.** Congressional proponents of amended Section 2 were at pains in debate and committee reports to disclaim any intention or power by Congress to overrule the Supreme Court's constitutional interpretation in *Bolden* only that the relevant constitutional provisions prohibited intentional racial vote dilution, and to assert instead a power comparable to that exercised in the enactment of Section 5 of the Voting Rights Act to provide a judicial remedy for enforcement of the states's affirmative obligations to come into compliance. *See, e.g.*, S.Rep. 97–417, *supra* note 10, at 41 ("Congress cannot alter the judicial interpretations in *Bolden* .... [T]he proposal is a proper statutory exercise of Congress' enforcement power....").

No challenge is made in this action to the constitutionality of Section 2 as a valid exercise of Congress's enforcement powers under the fourteenth (and possibly fifteenth) amendment,

and we assume constitutionality on that basis. *See Major v. Treen, supra,* 342–49 (upholding constitutionality against direct attack).

**17.** *See Voting Rights Act: Hearings Before the Subcomm. on the Constitution of the Senate Comm. on the Judiciary,* 97th Cong., 2d Sess. 542–46 (Feb. 1, 1982) (hereafter *Senate Hearings* ) (prepared statement of Professor McManus, pointing to disagreements within black community leadership over relative virtues of local districting plans).

**18.** *See Subcommittee on the Constitution of the Senate Committee on the Judiciary,* 97th Cong., 2d Sess., Voting Rights Act, Report on S. 1992, at 42–43 (Comm.Print 1982) (hereafter *Subcommittee Report* ), *reprinted in* S.Rep. No. 97–417, *supra* note 10, 107, 149 (asserting "detrimental consequence of establishing racial polarity in voting where none existed, or was merely episodic, and of establishing race as an accepted factor in the decision-making of elected officials"); *Subcommittee Report, supra,* at 45, *reprinted in* S.Rep. No. 97–417, *supra* note 10, at 150 (asserting that amended Section 2 would aggravate segregated housing patterns by encouraging blacks to remain in safe black legislative districts).

**19.** *See Subcommittee Report, supra* note 18, at 43–44, *reprinted in* S.Rep. No. 97–417, *supra* note 10, at 149–50.

that the recognition of "group voting rights" and the imposing of affirmative obligation upon government to secure those rights by race-conscious electoral mechanisms was alien to the American political tradition.[20]

■ For courts applying Section 2, the significance of Congress's general rejection or assumption of these risks as a matter of political judgment is that they are not among the circumstances to be considered in determining whether a challenged electoral mechanism presently "results" in racial vote dilution, either as a new or perpetuated condition. If it does, the remedy follows, all risks to these values having been assessed and accepted by Congress. It is therefore irrelevant for courts applying amended Section 2 to speculate or to attempt to make findings as to whether a presently existing condition of racial vote dilution is likely in due course to be removed by normal political processes, or by affirmative acts of the affected government, or that some elements of the racial minority prefer to rely upon those processes rather than having the judicial remedy invoked.

## III

### Findings of Fact

#### A.

### The Challenged Districts

The redistricting plans for the North Carolina Senate and House of Representatives enacted by the General Assembly of North Carolina in April of 1982 included six multi-member districts and one single-member district that are the subjects of the racial vote dilution challenge in this action.

The multi-member districts, each of which continued pre-existing districts and apportionments, are as follows, with their compositions, their apportionments of members and the percentage of their total populations and of their registered voters that are black:

| District | % of Population that is Black | % of Registered Voters that is Black (as of 10/4/82) |
|---|---|---|
| Senate No. 22 (Mecklenburg and Cabarrus Counties) (4 members) | 24.3 | 16.8 |
| House No. 36 (Mecklenburg County) (8 members) | 26.5 | 18.0 |
| House No. 39 (Part of Forsyth County) (5 members) | 25.1 | 20.8 |
| House No. 23 (Durham County) (3 members) | 36.3 | 28.6 |
| House No. 21 (Wake County) (6 members) | 21.8 | 15.1 |
| House No. 8 (Wilson, Nash and Edgecombe Counties) (4 members) | 39.5 | 29.5 |

As these districts are constituted, black citizens make up distinct population and registered-voter minorities in each.

Of these districts, only House District No. 8 is in an area of the state covered by § 5 of the Voting Rights Act.

20. *See Senate Hearings, supra,* note 17, at 1351–54 (Feb. 12, 1982) (prepared statement of Professor Blumstein); *id.* at 509–10 (Jan. 28, 1982) (prepared statement of Professor Erler), *reprint-* ed in S.Rep. No. 97–417, *supra* note 10, at 147; *id.* at 231 (Jan. 27, 1982) (testimony of Professor Berns), *reprinted in* S.Rep. No. 97–417, *supra* note 10, at 147.

■ At the time of the creation of these multi-member districts, there were concentrations of black citizens within the boundaries of each that were sufficient in numbers and contiguity to constitute effective voting majorities in single-member districts lying wholly within the boundaries of the multi-member districts, which single-member districts would satisfy all constitutional requirements of population and geographical configuration. For example, concentrations of black citizens embraced within the following single-member districts, as depicted on exhibits before the court, would meet those criteria:

| Multi-Member District | Single-Member District: location and racial composition | Exhibit |
|---|---|---|
| Senate No. 22 (Mecklenburg/Cabarrus Counties) | Part of Mecklenburg County; 70.0% Black | Pl. Ex. 9 |
| House No. 36 (Mecklenburg County) | (1) Part of Mecklenburg County; 66.1% Black | Pl. Ex. 4 |
| | (2) Part of Mecklenburg County; 71.2% Black | Pl. Ex. 4 |
| House No. 39 (Part of Forsyth County) | Part of Forsyth County; 70.0% Black | Pl. Ex. 5 |
| House No. 23 (Durham County) | Part of Durham County; 70.9% Black | Pl. Ex. 6 – substitute |
| House No. 21 (Wake County) | Part of Wake County; 67.0% Black | Pl. Ex. 7 |
| House No. 8 (Wilson, Edgecombe, Nash Counties) | Parts of Wilson, Edgecombe and Nash Counties; 62.7% Black | Pl. Ex. 8 |

The single-member district is Senate District No. 2 in the rural northeastern section of the state. It was formed by extensive realignment of existing districts to encompass an area which formerly supplied components of two multi-member Senate districts (No. 1 of 2 members; No. 6 of 2 members). It consists of the whole of Northampton, Hertford, Gates, Bertie, and Chowan Counties, and parts of Washington, Martin, Halifax and Edgecombe Counties. Black citizens made up 55.1% of the total population of the district, and 46.2% of the population that is registered to vote. This does not constitute them an effective voting majority in this district.[21]

This district is in an area of the state covered by § 5 of the Voting Rights Act.

At the time of creation of this single-member district, there was a concentration of black citizens within the boundaries of this district and those of adjoining Senate District No. 6 that was sufficient in numbers and in contiguity to constitute an effective voting majority in a single-member district, which single-member district would

21. We need not attempt at this point to define the exact population level at which blacks would constitute an effective (non-diluted) voting majority, either generally or in this area. Defendant's expert witness testified that a general "rule of thumb" for insuring an effective voting majority is 65%. This is the percentage used as a "benchmark" by the Justice Department in administering § 5. Plaintiffs' expert witness opined that a 60% population majority in the area of this district could only be considered a "competitive" one rather than a "safe" one.

On the uncontradicted evidence adduced we find—and need only find for present purposes—that the extant 55.1% black population majority does not constitute an effective voting majority, i.e., does not establish *per se* the absence of racial vote dilution, in this district. *See Kirksey v. Board of Supervisors,* 554 F.2d 139, 150 (5th Cir.1977) ("Where ... cohesive black voting strength is fragmented among districts, ... the presence of districts with bare *population majorities* not only does not necessarily preclude dilution but ... may actually enhance the possibility of continued minority political impotence.").

satisfy all constitutional requirements of population and geographical configuration. For example, a concentration of black voters embraced within a district depicted on Plaintiff's Exhibit 10(a) could minimally meet these criteria, though a still larger concentration might prove necessary to make the majority a truly effective one, depending upon experience in the new district alignments. In such a district, black citizens would constitute 60.7% of the total population and 51.02% of the registered voters (as contrasted with percentages of 55.1% and 46.2%, respectively, in challenged Senate District 2).

## B.

*Circumstances Relevant to the Claim of Racial Vote Dilution: the "Zimmer Factors"*

At the time the challenged districting plan was enacted in 1982, the following circumstances affected the plan's effect upon the voting strength of black voters of the state (the plaintiff class), and particularly those in the areas of the challenged districts.

### A History of Official Discrimination Against Black Citizens in Voting Matters

Following the emancipation of blacks from slavery and the period of post-war Reconstruction, the State of North Carolina had officially and effectively discriminated against black citizens in matters touching their exercise of the voting franchise for a period of around seventy years, roughly two generations, from ca. 1900 to ca. 1970. The history of black citizens' attempts since the Reconstruction era to participate effectively in the political process and the white majority's resistance to those efforts is a bitter one, fraught with racial animosities that linger in diminished but still evident form to the present and that remain centered upon the voting strength of black citizens as an identified group.

From 1868 to 1875, black citizens, newly emancipated and given the legal right to vote, effectively exercised the franchise, in coalition with white Republicans, to control the state legislature. In 1875, the Democratic Party, overwhelmingly white in composition, regained control of state government and began deliberate efforts to reduce participation by black citizens in the political processes. These efforts were not immediately and wholly successful and black male citizens continued to vote and to hold elective office for the remainder of the nineteenth century.

This continued participation by black males in the political process was furthered by the Fusionists' (Populist and Republican coalition) assumption of control of the state legislature in 1894. For a brief season, this resulted in legislation favorable to black citizens' political participation as well as their economic advancement.

The Fusionists' legislative program favorable to blacks impelled the white-dominated Democratic Party to undertake an overt white supremacy political campaign to destroy the Fusionist coalition by arousing white fears of Negro rule. This campaign, characterized by blatant racist appeals by pamphlet and cartoon, aided by acts of outright intimidation, succeeded in restoring the Democratic Party to control of the legislature in 1898. The 1898 legislature then adopted constitutional amendments specifically designed to disenfranchise black voters by imposing a poll tax and a literacy test for voting with a grandfather clause for the literacy test whose effect was to limit the disenfranchising effect to blacks. The amendments were adopted by the voters of the state, following a comparable white supremacy campaign, in 1900. The 1900 official literacy test continued to be freely applied for 60 years in a variety of forms that effectively disenfranchised most blacks. In 1961, the North Carolina Supreme Court declared unconstitutional the practice of requiring a registrant to write the North Carolina Constitution from dictation, but upheld the practice of requiring a registrant "of uncertain ability" to read and copy in writing the state Constitution. *Bazemore v. Bertie County Board of Elections,* 254 N.C. 398,

119 S.E.2d 637 (1961). At least until around 1970, the practice of requiring black citizens to read and write the Constitution in order to vote was continued in some areas of the state. Not until around 1970 did the State Board of Elections officially direct cessation of the administration of any form of literacy test.

Other official voting mechanisms designed to minimize or cancel the potential voting strength of black citizens were also employed by the state during this period. In 1955, an anti-single shot voting law applicable to specified municipalities and counties was enacted. It was enforced, with the intended effect of fragmenting a black minority's total vote between two or more candidates in a multi-seat election and preventing its concentration on one candidate, until declared unconstitutional in 1972 in *Dunston v. Scott*, 336 F.Supp. 206 (E.D. N.C.1972). In 1967, a numbered-seat plan for election in multi-member legislative districts was enacted. Its effect was, as intended, to prevent single-shot voting in multi-member legislative districts. It was applied until declared unconstitutional in the *Dunston* case, *supra*, in 1972.

In direct consequence of the poll tax and the literacy test, black citizens in much larger percentages of their total numbers than the comparable percentages of white citizens were either directly denied registration or chilled from making the attempt from the time of imposition of these devices until their removal. After their removal as direct barriers to registration, their chilling effect on two or more generations of black citizens has persisted to the present as at least one cause of continued relatively depressed levels of black voter registration. Between 1930 and 1948 the percentage of black citizens who successfully sought to register under the poll tax and literacy tests increased from zero to 15%. During this eighteen-year period that only ended after World War II, no black was elected to public office in the state. In 1960, twelve years later, after the Supreme Court decision in *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), only 39.1% of the black voting age population was registered to vote, compared to 92.1% of age-qualified whites. By 1971, following the civil rights movement, 44.4% of age-qualified blacks were registered compared to 60.6% of whites. This general range of statewide disparity continued into 1980, when 51.3% of age-qualified blacks and 70.1% of whites were registered, and into 1982 when 52.7% of age-qualified blacks and 66.7% of whites were registered.[22]

**22.** The recent history of white and black voter registration statewide and in the areas of the challenged districts is shown on the following chart.

| | Percent of Voting Age Population Registered to Vote | | | | | |
|---|---|---|---|---|---|---|
| | 10/78 | | 10/80 | | 10/82 | |
| | White | Black | White | Black | White | Black |
| Whole State | 61.7 | 43.7 | 70.1 | 51.3 | 66.7 | 52.7 |
| Mecklenburg | 71.3 | 40.8 | 73.8 | 48.4 | 73.0 | 50.8 |
| Forsyth | 65.8 | 58.7 | 76.3 | 67.7 | 69.4 | 64.1 |
| Durham | 63.0 | 39.4 | 70.7 | 45.8 | 66.0 | 52.9 |
| Wake | 61.2 | 37.5 | 76.0 | 48.9 | 72.2 | 49.7 |
| Wilson | 60.9 | 36.3 | 66.9 | 40.9 | 64.2 | 48.0 |
| Edgecombe | 63.8 | 37.9 | 68.2 | 50.4 | 62.7 | 53.1 |
| Nash | 61.2 | 39.0 | 72.0 | 41.2 | 64.2 | 43.0 |
| Bertie | 75.6 | 46.0 | 77.0 | 54.1 | 74.6 | 60.0 |
| Chowan | 71.3 | 44.3 | 77.4 | 53.9 | 74.1 | 54.0 |
| Gates | 80.9 | 73.5 | 83.9 | 77.8 | 83.6 | 82.3 |
| Halifax | 66.8 | 40.9 | 72.0 | 50.4 | 67.3 | 55.3 |
| Hertford | 75.6 | 56.6 | 81.8 | 62.5 | 68.7 | 58.3 |
| Martin | 69.3 | 49.7 | 76.9 | 55.3 | 71.2 | 53.3 |
| Northampton | 72.4 | 58.5 | 77.0 | 63.9 | 82.1 | 73.9 |
| Washington | 74.3 | 62.8 | 82.2 | 66.0 | 75.6 | 67.4 |

Under the present Governor's administration an intelligent and determined effort is being made by the State Board of Elections' to increase the percentages of both white and black voter registrations, with special emphasis being placed upon increasing the levels of registration in groups, including blacks, in which those levels have traditionally been depressed relative to the total voting age population. This good faith effort by the currently responsible state agency, directly reversing official state policies which persisted for more than seventy years into this century, is demonstrably now producing some of its intended results. If continued on a sustained basis over a sufficient period, the effort might succeed in removing the disparity in registration which survives as a legacy of the long period of direct denial and chilling by the state of registration by black citizens. But at the present time the gap has not been closed, and there is of course no guarantee that the effort will be continued past the end of the present state administration.

The present condition—which we assess—is that, on a statewide basis, black voter registration remains depressed relative to that of the white majority, in part at least because of the long period of official state denial and chilling of black citizens' registration efforts. This statewide depression of black voter registration levels is generally replicated in the areas of the challenged districts, and in each is traceable in part at least to the historical statewide pattern of official discrimination here found to have existed.

*Effects of Racial Discrimination in Facilities, Education, Employment, Housing and Health*

In consequence of a long history, only recently alleviated to some degree, of racial discrimination in public and private facility uses, education, employment, housing and health care, black registered voters of the state remain hindered, relative to the white majority, in their ability to participate effectively in the political process.

At the start of this century, *de jure* segregation of the races in practically all areas of their common life existed in North Carolina. This condition continued essentially unbroken for another sixty-odd years, through both World Wars and the Korean conflict, and through the 1950's. During this period, in addition to prohibiting interracial marriages, state statutes provided for segregation of the races in fraternal orders and societies; the seating and waiting rooms of railroads and other common carriers; cemeteries; prisons, jails and juvenile detention centers; institutions for the blind, deaf and mentally ill; public and some private toilets; schools and school districts; orphanages; colleges; and library reading rooms. With the exception of those laws relating to schools and colleges, most of these statutes were not repealed until after passage of the federal Civil Rights Act of 1964, some as late as 1973.

Public schools in North Carolina were officially segregated by race until 1954 when *Brown v. Board of Education* was decided. During the long period of *de jure* segregation, the black schools were consistently less well funded and were qualitatively inferior. Following the *Brown* decision, the public schools remained substantially segregated for yet another fifteen years on a *de facto* basis, in part at least because of various practical impediments erected by the state to judicial enforcement of the constitutional right to desegregated public education recognized in *Brown*. As late as 1960, only 226 black students throughout the entire state attended formerly all-white public schools. Until the end of the 1960's, practically all the state's public schools remained almost all white or almost all black. Substantial desegregation of the public schools only began to take place around a decade ago, following the Supreme Court's decision in *Swann v. Mecklenburg County Board of Education*, 402 U.S. 1, 91 S.Ct.

1267, 28 L.Ed.2d 554 (1971). In the interval since, "white-flight" patterns in some areas of the state have prevented or reversed developing patterns of desegregation of the schools. In consequence, substantial pockets of *de facto* segregation of the races in public school education have re-arisen or have continued to exist to this time though without the great disparities in public funding and other support that characterized *de jure* segregation of the schools.

Because significant desegregation of the public schools only commenced in the early 1970's, most of the black citizens of the state who were educated in this state and who are over 30 years of age attended qualitatively inferior racially segregated public schools for all or most of their primary and secondary education. The first group of black citizens who have attended integrated public schools throughout their educational careers are just now reaching voting age. In at least partial consequence of this segregated pattern of public education and the general inferiority of *de jure* segregated black schools, black citizens of the state who are over 25 years of age are substantially more likely than whites to have completed less than 8 years of education (34.6% of blacks; 22.0% of whites), and are substantially less likely than whites to have had any schooling beyond high school (17.3% of blacks; 29.3% of whites).

Residential housing patterns in North Carolina, as generally in states with histories of *de jure* segregation, have traditionally been separated along racial lines. That pattern persists today in North Carolina generally and in the areas covered by the challenged districts specifically; in the latter, virtually all residential neighborhoods are racially identifiable. Statewide, black households are twice as likely as white households to be renting rather than purchasing their residences and are substantially more likely to be living in overcrowded housing, substandard housing, or housing with inadequate plumbing.

Black citizens of North Carolina have historically suffered disadvantage relative to white citizens in public and private employment. Though federal employment discrimination laws have, since 1964, led to improvement, the effects of past discrimination against blacks in employment continue at present to contribute to their relative disadvantage. On a statewide basis, generally replicated in the challenged districts in this action, blacks generally hold lower paying jobs than do whites, and consistently suffer higher incidences of unemployment. In public employment by the state, for example, a higher percentage of black employees than of whites is employed at every salary level below $12,000 per year and a higher percentage of white employees than black is employed at every level above $12,000.

At least partially because of this continued disparity in employment opportunities, black citizens are three times as likely as whites to have incomes below the poverty level (30% to 10%); the mean income of black citizens is 64.9% that of white citizens; white families are more than twice as likely as black families to have incomes over $20,000; and 25.1% of all black families, compared to 7.3% of white families, have no private vehicle available for transportation.

In matters of general health, black citizens of North Carolina are, on available primary indicators, as a group less physically healthy than are white citizens as a group. On a statewide basis, the infant mortality rate (the standard health measure used by sociologists) is approximately twice as high for non-whites (predominately blacks) as for whites. This statewide figure is generally replicated in Mecklenburg, Forsyth, Durham, Wake, Wilson, Edgecombe and Nash Counties (all included within the challenged multi-member districts). Again, on a statewide basis, the death rate is higher for black citizens than

for white, and the life-expectancy of black citizens is shorter than is that of whites.

■ On all the socio-economic factors treated in the above findings, the status of black citizens as a group is lower than is that of white citizens as a group. This is true statewide, and it is true with respect to every county in each of the districts under challenge in this action. This lower socio-economic status gives rise to special group interests centered upon those factors. At the same time, it operates to hinder the group's ability to participate effectively in the political process and to elect representatives of its choice as a means of seeking government's awareness of and attention to those interests.[23]

### Other Voting Procedures That Lessen the Opportunity of Black Voters to Elect Candidates of Their Choice

In addition to the numbered seat requirement and the anti-single shot provisions of state law that were declared unconstitutional in 1972, see supra p. 360, North Carolina has, since 1915, had a majority vote requirement which applies to all primary elections, but not to general elections. N.C.G.S. § 163-111.[24]

The general effect of a majority vote requirement is to make it less likely that the candidates of any identifiable voting minority will finally win elections, given the necessity that they achieve a majority of votes, if not in a first election, then (if called for) in a run-off election. This generally adverse effect on any cohesive voting minority is, of course, enhanced for racial minority groups if, as we find to be

the fact in this case, see infra pp. 367–372, racial polarization in voting patterns also exists.

While no black candidate for election to the North Carolina General Assembly—either in the challenged districts or elsewhere—has so far lost (or failed to win) an election solely because of the majority vote requirement, the requirement nevertheless exists as a continuing practical impediment to the opportunity of black voting minorities in the challenged districts to elect candidates of their choice.

The North Carolina majority vote requirement manifestly operates with the general effect noted upon all candidates in primary elections. Since 1950, eighteen candidates for the General Assembly who led first primaries with less than a majority of votes have lost run-off elections, as have twelve candidates for other statewide offices, including a black candidate for Lt. Governor and a black candidate for Congress. The requirement therefore necessarily operates as a general, ongoing impediment to any cohesive voting minority's opportunity to elect candidates of its choice in any contested primary, and particularly to any racial minority in a racially-polarized vote setting.[25]

North Carolina does not have a subdistrict residency requirement for members of the Senate and House elected from multi-member districts, a requirement which could to some degree off-set the disadvantage of any voting minority in multi-member districts.[26]

---

**23.** Section 2 claimants are not required to demonstrate by direct evidence a causal nexus between their relatively depressed socio-economic status and a lessening of their opportunity to participate effectively in the political process. See S.Rep. No. 97–417, supra note 10, at 29 n. 114. Under incorporated White v. Regester jurisprudence, "[i]nequality of access is an inference which flows from the existence of economic and educational inequalities." Kirksey v. Board of Supervisors, 554 F.2d 139, 145 (5th Cir.), cert. denied, 434 U.S. 968, 98 S.Ct. 512, 54 L.Ed.2d 454 (1977). Independently of any such general presumption incorporated in amended

Section 2, we would readily draw the inference from the evidence in this case.

**24.** There is no suggestion that when originally enacted in 1915, its purpose was racially discriminatory. That point is irrelevant in assessing its present effect, as a continued mechanism, in the totality of circumstances bearing upon plaintiffs' dilution claim. See Part II, supra.

**25.** See White v. Regester, 412 U.S. 755, 766, 93 S.Ct. 2332, 2339, 37 L.Ed.2d 314 (1973).

**26.** See id. at 766 n. 10, 93 S.Ct. at 2340 n. 10.

## Use of Racial Appeals in Political Campaigns

From the Reconstruction era to the present time, appeals to racial prejudice against black citizens have been effectively used by persons, either candidates or their supporters, as a means of influencing voters in North Carolina political campaigns. The appeals have been overt and blatant at some times, more subtle and furtive at others. They have tended to be most overt and blatant in those periods when blacks were openly asserting political and civil rights—during the Reconstruction-Fusion era and during the era of the major civil rights movement in the 1950's and 1960's. During the period from ca. 1900 to ca. 1948 when black citizens of the state were generally quiescent under *de jure* segregation, and when there were few black voters and no black elected officials, racial appeals in political campaigning were simply not relevant and accordingly were not used. With the early stirrings of what became the civil rights movement following World War II, overt racial appeals reappeared in the campaigns of some North Carolina candidates. Though by and large less gross and virulent than were those of the outright white supremacy campaigns of 50 years earlier, these renewed racial appeals picked up on the same obvious themes of that earlier time: black domination or influence over "moderate" or "liberal" white candidates and the threat of "negro rule" or "black power" by blacks "bloc voting" for black candidates or black-"dominated" candidates. In recent years, as the civil rights movement, culminating in the Civil Rights Act of 1964, completed the eradication of *de jure* segregation, and as overt expressions of racist attitudes became less socially acceptable, these appeals have become more subtle in form and furtive in their dissemination, but they persist to this time.

The record in this case is replete with specific examples of this general pattern of racial appeals in political campaigns. In addition to the crude cartoons and pamphlets of the outright white supremacy campaigning of the 1890's which featured white political opponents in the company of black political leaders, later examples include various campaign materials, unmistakably appealing to the same racial fears and prejudices, that were disseminated during some of the most hotly contested statewide campaigns of the state's recent history: the 1950 campaign for the United States Senate; the 1954 campaign for the United States Senate; the 1960 campaign for Governor; the 1968 campaign for Governor; the 1968 Presidential campaign in North Carolina; the 1972 campaign for the United States Senate; and most recently, in the imminent 1984 campaign for the United States Senate.

Numerous other examples of assertedly more subtle forms of "telegraphed" racial appeals in a great number of local and statewide elections, abound in the record. Laying aside the more attenuated forms of arguably racial allusions in some of these, we find that racial appeals in North Carolina political campaigns have for the past thirty years been widespread and persistent.

The contents of these materials reveal an unmistakable intention by their disseminators to exploit existing fears and prejudices and to create new fears and prejudices on the part of white citizens in regard to black citizens and to black citizens' participation in the political processes of the state. The continued dissemination of these materials throughout this period and down to the present time evidences an informed perception by the persons who have disseminated them that they have had their intended effect to a degree warranting their continued use.

On this basis, we find that the historic use of racial appeals in political campaigns in North Carolina persists to the present time and that its effect is presently to lessen to some degree the opportunity of black citizens to participate effectively in the political processes and to elect candidates of their choice.

### The Extent of Election of Black Citizens to Public Office

*Statewide history.* It appears that, with one exception, no black citizen was elected

during this century to public office in North Carolina until after World War II. In 1948 and during the early 1950's a few black citizens were elected to various city councils. Twenty years later, in 1970, there were in the state 62 black elected officials. In 1969 a black citizen was elected to the State House of Representatives for the first time since Reconstruction; in 1975 two blacks were elected, for the first time, to the Senate. From 1970 to 1975 the number of black elected officials increased from 62 to over 200 statewide; in 1982, that number had increased to 255.

At present the number of elected black officials remains quite low in relation to total black population, which is 22.4% of the state total. Black citizens hold 9% of the city council seats (in cities of over 500 population); 7.3% of county commission seats; 4% of sheriff's offices; and 1% of the offices of Clerk of Superior Court. There are 19 black mayors, 13 of whom are in majority black municipalities. Of the black city council members, approximately 40% are from majority black municipalities or election districts. Three black judges have been elected in statewide elections to seats to which they had been appointed by the Governor. Other than these judges, no black has yet been elected during this century to any statewide office or to the Congress of the United States as a representative of this state.

Between 1971 and 1982 there have been, at any given time, between two and four black members of the North Carolina House of Representatives out of a total of 120—between 1.6% and 3.3%. From 1975 to 1983 there have been, at any given time, either one or two black members of the State Senate out of a total of 50—between 2% and 4%. Most recently, in 1982, after this action was filed, 11 black citizens were elected to the State House of Representatives. Six of those 11 were elected from multi-member districts in which blacks constituted a voting minority (including 5 of those challenged); 5 were elected from newly created majority black districts.

Historically, in those multi-member districts where some blacks have succeeded in being elected, overall black candidacies have been significantly less successful than white candidacies. Black candidates who, between 1970 and 1982, won in Democratic primaries in the six multi-member districts under challenge here were three times as likely to lose in the general election as were their white Democratic counterparts, a fact of statistical significance in assessing the continued effect of race in those elections.

### In the Challenged Multi-Member Districts

*House District 36 (Mecklenburg County); Senate District 22 (Mecklenburg/Cabarrus Counties).*

In this century one black citizen has been elected to the State House of Representatives and one black citizen has been elected to the State Senate from Mecklenburg County. The House member was elected as one of an eight-member delegation in 1982, after this lawsuit was commenced. Seven other black citizens had previously run unsuccessfully for a House seat. The Senate member served as one of a 4-member delegation from Mecklenburg and Cabarrus Counties from 1975 to 1980. Since then two black citizens have run unsuccessfully and no black now serves on the Senate delegation.

Since World War II, blacks, who now constitute 31% of the city's population, have been elected to the City Council of Charlotte, but never in numbers remotely proportional to their percentage of the city's population. During the period 1945 to 1975, when the council was elected all at-large, blacks constituted 5.4% of its membership. From 1977–1981, when the council was elected partially at-large and partially by districts, blacks won 28.6% of the district seats compared with 16.7% of the at-large seats, though more ran for the latter than the former.

One black citizen has been elected (three times) and defeated one time for membership on the five-member County Board of Commissioners, and presently serves. Two

black citizens have been elected and now serve on the nine-member County Board of Education.

Following trial of this action, a black citizen was elected mayor of the City of Charlotte, running as a Democrat against a white Republican. The successful black candidate, a widely-respected architect, received approximately 38% of the white vote.

*House District No. 39 (part of Forsyth County).*

Before 1974 black citizens had been elected to the City Council of Winston-Salem, but to no other public office. In 1974 and again in 1976 a black citizen was elected to the House of Representatives as one of a five-member delegation. In 1978 and 1980 other black citizens ran unsuccessfully for the House. In 1982, after this litigation was commenced, two black citizens were elected to the House.

No black citizen has been elected to the Senate from Forsyth County.

Since 1974, a black citizen has been elected, twice failed to be reelected, then succeeded in being reelected to one of eight seats on the otherwise all-white Board of Education; and another has been elected, failed to be reelected, then succeeded in being reelected to one of five seats on the otherwise all-white Board of County Commissioners.

*House District No. 23 (Durham County).*

Since 1973 a black citizen has been elected each two-year term to the State House. No black citizen has been elected to the Senate. Since 1969, blacks have been elected to the Board of County Commissioners, and three of twelve Durham City Council members are blacks elected in at-large elections. The City of Durham is 47% black in population.

*House District No. 21 (Wake County).*

A black citizen has been twice elected to the State House five-member delegation from this district and is presently serving. Another black citizen was elected for two terms to the State Senate, serving from 1975 to 1978.

A black citizen has been twice elected Sheriff of Wake County and is presently in that office. Another black citizen, who lives in an affluent white neighborhood, has served since 1972 as the only black on the seven-member County Board of Commissioners. Another black citizen, elected from a majority black district, serves as the only black on the nine-member County School Board. Another black citizen served one term as mayor of the City of Raleigh from 1973 to 1975, and still another serves on the Raleigh City Council.

*House District No. 8 (Edgecombe, Nash, Wilson Counties).*

There has never been a black member of the State House or Senate from the area covered by this district. There had never been a black member of the Board of County Commissioners of any of the three counties until 1982 when two blacks were elected to the five-member Board in Edgecombe County, in which blacks constitute 43% of the registered voters. In Wilson County, where the black population is 36.5% of the total, one of nine members of the County Board of Education is black. In the City of Wilson, which is over 40% black in population, one of six city councilmen is black.

*Senate District No. 2 (Northampton, Hertford, Gates, Bertie, Chowan, and parts of Washington, Martin, Halifax and Edgecombe Counties).*

No black person has ever been elected to the State Senate from any of the area covered by the district. In the last four years, black candidates have won three elections for the State House from areas within the borders of this district, one in 1980 in a majority-white multi-member district, two in 1982 in different majority-black districts. In Gates County, where 49% of the registered voters are black, a black citizen has been elected and presently serves as Clerk of Court. In Halifax County, black citizens have run unsuccessfully for the Board of County Commissioners and for the City Council of Roanoke Rapids.

■ Looking only to these basic historical facts respecting black citizens' election to public office, we draw the following inferences. Thirty-five years after the first successful candidacies for public office by black citizens in this century, it has now become possible for black citizens to be elected to office at all levels of state government in North Carolina. The chances of a black candidate's being elected are better where the candidacy is in a majority-black constituency, where the candidacy is in a single-member rather than a multi-member or at-large district, where it is for local rather than statewide office, and where the black candidate is a member of the political party currently in the ascendancy with voters. Relative to white candidates running for the same office at whatever level, black candidates remain at a disadvantage in terms of relative probability of success. The overall results achieved to date at all levels of elective office are minimal in relation to the percentage of blacks in the total population. There are intimations from recent history, particularly from the 1982 elections, that a more substantial breakthrough of success could be imminent—but there were enough obviously aberrational aspects present in the most recent elections to make that a matter of sheer speculation.[27] In any event, the success that has been achieved by black candidates to date is, standing alone, too minimal in total numbers and too recent in relation to the long history of complete denial of any elective opportunities to compel or even arguably to support an ultimate finding that a black candidate's race is no longer a significant adverse factor in the political processes of the state— either generally or specifically in the areas of the challenged districts.

## Racial Polarization in Voting

■ Statistical evidence presented by duly qualified expert witnesses for plaintiffs, supplemented to some degree by direct testimony of lay witnesses, establishes, and we find, that within all the challenged districts racially polarized voting exists in a persistent and severe degree.

## Multi-Member Districts

To analyze the existence and extent of any racially polarized voting in the challenged multi-member districts, Dr. Bernard Grofman, a duly qualified expert witness for plaintiffs, had collected and studied data from 53 sets of recent election returns involving black candidacies in all of the challenged multi-member districts.[28] Based upon two complementary methods of analysis of the collected data,[29] Grofman

27. Both parties offered evidence—anecdotal, informed "lay opinion," and documentary—to establish on the one hand that recent black successes indicated an established breakthrough from any preexisting racial vote dilution and on the other, that those successes are too "haphazard" and aberrational in terms of specific candidacies, issues, and political trends and, in any event, still too minimal in numbers, to support any such ultimate inference. Heavily emphasized with respect to successful black candidacies in 1982 was the fact that in some elections the pendency of this very litigation worked a one-time advantage for black candidates in the form of unusual organized political support by white leaders concerned to forestall single-member districting, and that this cannot be expected to recur. Our finding, as stated in text, reflects our weighing of these conflicting inferences.

28. Included were all the elections for the General Assembly in which there were black candidates in Mecklenburg, Durham, and Forsyth County; elections for the State House of Repre-

sentatives in Wilson, Edgecombe, and Nash Counties; and elections for the State Senate in Cabarrus County for the election years 1978, 1980, and 1982; county-wide local elections in each of Wilson, Edgecombe and Nash Counties in which there were black candidates. The 53 elections included both primary and general elections and represented a total of 32 different election contests.

29. The two methods employed, both standard in the literature for the analysis of racially polarized voting, were an "extreme case" analysis and an "ecological regression" analysis. The extreme case analysis focuses on voting in racially segregated precincts; the regression analysis uses both racially segregated and racially mixed precincts and provides any corrective needed to reflect the fact that voters in the two types may behave differently. In Dr. Grofman's analysis the results under both methods conformed closely in most cases. The purpose of both methods is simply to determine the extent to

gave as his opinion, and we find, that in each of the elections analyzed racial polarization did exist and that the degree revealed in every election analyzed was statistically significant, in the sense that the probability of its occurring by chance was less than one in 100,000; [30] and that in all but two of the elections the degree revealed was so marked as to be substantively significant, in the sense that the results of the individual election would have been different depending upon whether it had been held among only the white voters or only the black voters in the election.[31]

Additional facts revealed by this data support the ultimate finding that severe (substantively significant) racial polarization existed in the multi-member district elections considered as a whole.[32] In none of the elections, primary or general, did a black candidate receive a majority of white votes cast. On the average, 81.7% of white voters did not vote for any black candidate in the primary elections. In the general elections, white voters almost always ranked black candidates either last or next to last in the multi-candidate field except in heavily Democratic areas; in these latter, white voters consistently ranked black candidates last among Democrats if not last or next to last among all candidates. In fact, approximately two-thirds of white voters did not vote for black candidates in general elections even after the candidate had won the Democratic primary and the only choice was to vote for a Republican or no one. Black incumbency alleviated the general level of polarization revealed, but it did not eliminate it. Some black incumbents were reelected, but none received a majority of

which blacks and whites vote differently from each other in relation to the race of candidates.

Defendants' duly qualified expert witness, Dr. Thomas Hofeller, had studied Dr. Grofman's data and the mathematics of his analysis of that data, and heard his live testimony. Aside from two mathematical or typographical errors, Dr. Hofeller did not question the accuracy of the data, its adequacy as a reliable sample for the purpose used, nor that the methods of analysis used were standard in the literature. He questioned the reliability of an extreme case analysis standing alone, but, as indicated, Dr. Grofman's did not stand alone. Dr. Hofeller also questioned Dr. Grofman's failure to make an exact count of voter turn-out by race rather than using estimated figures. The literature makes no such demand of precision in obtaining this figure, and Dr. Grofman's method of estimating is accepted. Dr. Hofeller made no specific suggestion of error in the figures used.

We have accepted the accuracy and reliability of the data collected and the methods of analysis used by Dr. Grofman for the purposes offered. The general reliability of Dr. Grofman's analysis was further confirmed by the testimony of Dr. Theodore Arrington, a duly qualified expert witness for the *Pugh* intervenor-plaintiffs, *see* note 4, *supra*. Proceeding by a somewhat different methodology and using different data, Dr. Arrington came to the same general conclusion respecting the extent of racial polarization in the narrower area of his study.

**30.** These conclusions were reached by determining the correlation between the voters of one race and the number of voters who voted for a candidate of specified race. In experience, correlations above an absolute value of .5 are rela-

tively rare and correlations above .9 extremely rare. All correlations found by Dr. Grofman in the elections studied had absolute values between .7 and .98, with most above .9. This reflected statistical significance at the .00001 level—probability of chance as explanation for the coincidence of voter's and candidate's race less than one in 100,000. *Cf. Major v. Treen, supra,* 337–38 n. 17 (comparable analysis of racial vote polarization by correlation coefficients).

**31.** The two exceptions involved 1982 State House elections in Durham and Wake Counties, respectively, in which black candidates were elected to seats in majority white multi-member districts. Both were incumbents, and in Durham County there were only two white candidates in the race for three seats so that the black candidate had to win. Though each black candidate won, neither received a majority of the white vote cast. These two exceptions did not alter Dr. Grofman's conclusion that, in his terms, racial polarization in the elections analyzed as a whole was substantively significant. Nor do they alter our finding to the same effect.

**32.** Defendants' expert witness questioned the accuracy of any opinion as to the "substantive" significance of statistically significant racial polarization in voting that did not factor in all of the circumstances that might influence particular votes in a particular election. This flies in the face of the general use, in litigation and in the general social science literature, of correlation analysis as the standard method for determining whether vote dilution in the legal (substantive) sense exists, a use conceded by defendant's expert.

white votes even when the election was essentially uncontested. Republican voters were more disposed to vote for white Democrats than to vote for black Democrats. The racial polarization revealed, of course, runs both ways, but it was much more disadvantageous to black voters than to white. Aside from the basic population and registered voter majority advantages had by white voters in any racially polarized setting, fewer white voters voted for black candidates than did black voters for white candidates. In these elections, a significant segment of the white voters would not vote for any black candidate, but few black voters would not vote for any white candidate. One revealed consequence of this disadvantage is that to have a chance of success in electing candidates of their choice in these districts, black voters must rely extensively on single-shot voting, thereby forfeiting by practical necessity their right to vote for a full slate of candidates.

The racial polarization revealed in the multi-member elections considered as a whole exists in each of the challenged districts considered separately, as indicated by the following specific findings related to elections within each district.

*House District No. 36 and Senate District No. 22 (Mecklenburg and Cabarrus Counties).*

In elections in House District No. 36 (Mecklenburg County) between 1980 and 1982, the following percentages of black and white voters voted for the black candidates indicated:

|  | Primary | | General | |
|  | White | Black | White | Black |
|---|---|---|---|---|
| 1980 (Maxwell) | 22 | 71 | 28 | 92 |
| 1982 (Berry) | 50 | 79 | 42 | 92 |
| 1982 (Richardson) | 39 | 71 | 29 | 88 |

In elections in Senate District No. 22 (Mecklenburg and Cabarrus Counties) between 1978 and 1982, the following percentages of white and black voters voted for the black candidates indicated:

|  | Primary | | General | |
|  | White | Black | White | Black |
|---|---|---|---|---|
| 1978 (Alexander) | 47 | 87 | 41 | 94 |
| 1980 (Alexander) | 23 | 78 | n/a | n/a |
| 1982 (Polk) | 32 | 83 | 33 | 94 |

The fact that candidate Berry received votes from one half of the white voters in the primary does not alter the conclusion that there is substantial racially polarized voting in Mecklenburg County in primaries. There were only seven white candidates for eight positions in the primary and one black candidate had to be elected. Berry, the incumbent chairman of the Board of Education, ranked first among black voters but seventh among whites.

The only other black candidate who approached receiving as many as half of the white votes was Fred Alexander, running in the 1978 Senate primary as an incumbent. Alexander ranked last among white voters in the primary and would have been defeated if the election had been held only among the white voters.

Approximately 60% of the white voters voted for neither Berry nor Alexander in the general election.

*House District No. 39 (Forsyth County).*

In House and Senate elections in Forsyth County from 1978–1982 the following percentages of white and black voters voted for the black candidates indicated:

| | Primary | | General | |
|---|---|---|---|---|
| | White | Black | White | Black |
| **1978 House –** | | | | |
| Kennedy, H. | 28 | 76 | 32 | 93 |
| Norman | 8 | 29 | n/a | n/a |
| Ross | 17 | 53 | n/a | n/a |
| Sumter (Repub.) | n/a | n/a | 33 | 25 |
| **1980 House –** | | | | |
| Kennedy, A. | 40 | 86 | 32 | 96 |
| Norman | 18 | 36 | n/a | n/a |
| **1980 Senate –** | | | | |
| Small | 12 | 61 | n/a | n/a |
| **1982 House –** | | | | |
| Hauser | 25 | 80 | 42 | 87 |
| Kennedy, A. | 36 | 87 | 46 | 94 |

As revealed by this data, no black candidate, whether successful or not, has received more than 40% of the white votes cast in a primary, and no black candidate has received more than 46% of the white votes cast in a general election during the last four elections.

Though black candidates Kennedy and Hauser won the House election in 1982, this does not alter the conclusion that substantial racial polarization of voting continued through that election. White voters ranked Kennedy and Hauser seventh and eighth, respectively, out of eight candidates in the general election. In contrast black voters ranked them first and second respectively.

*House District No. 23 (Durham County).*

In House and Senate Elections from 1978 through 1982, the following percentages of white and black voters voted for the black candidates indicated:

| | Primary | | General | |
|---|---|---|---|---|
| | White | Black | White | Black |
| **1978 Senate –** | | | | |
| Barns (Repub.) | n/a | n/a | 17 | 5 |
| **1978 House –** | | | | |
| Clement | 10 | 89 | n/a | n/a |
| Spaulding | 16 | 92 | 37 | 89 |
| **1980 House –** | | | | |
| Spaulding | n/a | n/a | 49 | 90 |
| **1982 House –** | | | | |
| Clement | 26 | 32 | n/a | n/a |
| Spaulding | 37 | 90 | 43 | 89 |

Black candidate Spaulding ran uncontested in the general election in 1978 and in the primary and general election in 1980. In the 1982 election there was no Republican opposition and the general election was, for all practical purposes, unopposed. A majority of white voters failed to vote for the black candidate in the general election in each of these years even when they had no other choice. Furthermore, in the 1982 primary, there were only two white candidates for three seats so that one black necessarily had to win. Even in this situation, 63% of white voters did not vote for

the black incumbent, the clear choice of the black voters. At least 37% of white voters voted for no black candidate even when one was certain to be elected.

*House District No. 21 (Wake County).*

In elections for the North Carolina House of Representatives from 1978 through 1982 the following percentages of white and black voters voted for the black candidate indicated:

|  | Primary | | General | |
|---|---|---|---|---|
|  | White | Black | White | Black |
| 1978 (Blue) | 21 | 76 | n/a | n/a |
| 1980 (Blue) | 31 | 81 | 44 | 90 |
| 1982 (Blue) | 39 | 82 | 45 | 91 |

The fact that black candidate Blue won election in the last two of these candidacies does not alter the conclusion that substantial racial polarization in voting persists in this district. In Wake County winning the Democratic primary is historically tantamount to election. Nevertheless, in these elections from 60% to 80% of white voters did not vote for the black candidate in the primary compared to 76% and 80% of black voters who did.

Wake County is overwhelmingly Democratic in registration and normally votes along party lines. Nonetheless, 55% of white voters did not vote for the black Democrat in the general election.

*House District No. 8 (Wilson, Nash, Edgecombe Counties).*

In county-wide or district-wide elections from 1976 through 1982 in House District No. 8 and Wilson, Edgecombe and Nash Counties, the following percentages of white and black voters voted for the black candidates indicated:

|  | Primary | | General | |
|---|---|---|---|---|
|  | White | Black | White | Black |
| House District No. 8 |  |  |  |  |
| 1982 House–Carter | 4 | 66 |  |  |
| Wilson County |  |  |  |  |
| 1982 Congress–1st Primary–Michaux | 6 | 96 |  |  |
| –2nd Primary–Michaux | 7 | 98 |  |  |
| 1976 County Commission–Jones | 32 | 77 |  |  |
| Edgecombe County |  |  |  |  |
| 1982 Congress–1st Primary–Michaux | 2 | 84 |  |  |
| –2nd Primary–Michaux | 3 | 97 |  |  |
| 1982 County Commission–Green | 0 | 14 |  |  |
| –McClain | 0 | 27 |  |  |
| –Thorne | 4 | 75 | 38 | 91 |
| –Walker | 2 | 82 | 36 | 94 |
| Nash County |  |  |  |  |
| 1982 Congress–1st Primary | 6 | 73 |  |  |
| –2nd Primary | 6 | 81 |  |  |
| 1982 County Commission–Sumner | 9 | 82 |  |  |

With one exception, over this period more than 90% of the white voters have failed to vote for the black candidate in every primary in each of these three counties. The one time, in 1982, that black Democratic candidates have run in a general election, they failed to receive over 60% of the white vote even though Edgecombe County is overwhelmingly (88.5%) Democratic.

This data reveals racial polarization of voting in House District No. 8 so extreme that, all other factors aside, no black has any chance of winning election in the district as it is presently constituted. This conclusion, as expressed in evidence by plaintiffs' expert witness, was not seriously challenged by defendants.

### Single-Member District
### Senate District No. 2.

Essentially unchallenged and unrebutted opinion evidence given by plaintiffs' expert witness, Dr. Grofman, and testimonial evidence of experienced local political observers and black community leaders establishes that severe and persistent racial polarization in voting exists in the area covered by the challenged single-member Senate District No. 2.

Based on these evidentiary findings with respect to racial polarization in voting, we find that in each of the challenged districts racial polarization in voting presently exists to a substantial or severe degree, and that in each district it presently operates to minimize the voting strength of black voters.

### Other Factors Bearing Upon the Claim of Racial Vote Dilution
*Increased participation by black citizens in the political process.*

The court finds that in recent years there has been a measurable increase in the ability and willingness of black citizens to participate in the state's political processes and in its government at state and local levels. The present state administration has appointed a significant number of black citizens to judicial and executive positions in state government, and evinces a good faith determination further to open the political processes to black citizens by that means. In some areas of the state, including some of those directly involved in this litigation, there is increased willingness on the part of influential white politicians openly to draw black citizens into political coalitions and openly to support their candidacies. Indeed, among the witnesses for

the state were respected and influential political figures who themselves fit that description.

The court has considered what this implies for the plaintiffs' claim of present racial vote dilution—of a present lack of equal opportunity by black citizens relative to white citizens to participate in the political process and to elect candidates of their choice. Our conclusion is that though this wholesome development is undoubtedly underway and will presumably continue, it has not proceeded to the point of overcoming still entrenched racial vote polarization, and indeed has apparently done little to diminish the level of that single most powerful factor in causing racial vote dilution. The participatory level of black citizens is still minimal in relation to the overall black population, and, quite understandably, is largely confined to the relatively few forerunners who have achieved professional status or otherwise emerged from the generally depressed socio-economic status which, as we have found on the record produced in this case, remains the present lot of the great bulk of black citizens.

*Divisions within the black community.*

Not all black citizens in North Carolina, notwithstanding that the class technically certified in this action includes all who are registered to vote, share the same views about the present reality of racial vote dilution in the challenged districts (or presumably elsewhere), nor about the appropriate solution to any dilution that may exist.

Several black citizens testified in this action, as witnesses for the state, to this effect, identifying their own views as opposed to those advanced by plaintiffs' witnesses. In terms of their experience, achievement and general credibility as witnesses, the views of these defendant-witnesses were clearly as deserving of acceptance by the court as were those of the black citizens who, in larger numbers, testified as witnesses for the plaintiffs.

Two facts appeared, however, to the court. The first is that the views ex-

pressed by defendants' witnesses went almost exclusively to the desirability of the remedy sought by plaintiffs, and not to the present existence of a condition of vote dilution. The other fact is that the defendants' witnesses' views must be accounted, on the record adduced in this case, a distinct minority viewpoint within the plaintiff class as certified. The division between the two elements is essentially one of proper political ends and means to break free of racial vote dilution as a present condition, and not of the present existence of that condition. Only if a dissident element were so large as to draw in question the very existence of an identifiable black community whose "ability to participate" and "freedom to elect candidates of *its* choice" could rationally be assessed, could the existence of a dissident view have relevance to the establishment of a racial vote dilution claim. That clearly is not the circumstance here, on the record made in this action. As earlier indicated, the further political question of the proper means to eradicate such racial vote dilution as might be shown presently to exist has been decided by Congress and does not properly figure in our judicial inquiry. *See* Part II, *supra.*

*Fairness of the state legislative policy underlying the challenged redistricting.*

Under amended § 2 it presumably remains relevant to consider whether race-neutral and compelling state policies might justify a redistricting plan that concededly, or at least arguably, "results" *prima facie* in racial vote dilution. The Senate Report, discussing the continued relevance of the "tenuous state policy" inquiry as one of the incorporated *Zimmer* factors that evolved in *White v. Regester* dilution jurisprudence, indicates as much, though "tenuousness" as a gauge of *intent* is obviously no longer relevant under § 2's "result-only" test.

If the procedure markedly departs from past practices or from practices elsewhere in the jurisdiction, that bears on the fairness of its impact. But even a consistently applied practice premised on a racially neutral policy would not negate a plaintiff's showing through other fac-

tors that the challenged practice denies minorities fair access to the process. S.Rep. No. 97–417, *supra* note 10, at 29 & n. 117, U.S.Code Cong. & Admin.News 1982, p. 207. *See also Major v. Treen, supra,* 351–54 (analyzing state redistricting policy in terms of fairness).

The parties in this litigation have addressed the point under the "tenuous state policy" rebric, and we will assume the inquiry's continued relevance under a "results"—only test. On this basis, we are persuaded that no state policy, either as demonstrably employed by the legislature in its deliberations, or as now asserted by the state in litigation, could "negate a showing" here that actual vote dilution results from the challenged district plan.

During the legislative deliberations on the redistricting plan, the legislature was well aware of the possibility that its plan could result under then applicable federal law in impermissible dilution of black citizens' voting strength if concentrations of black voters were intentionally "submerged" in multi-member districts or "fractured" into separate districts. That fact was brought to its attention by special counsel, by black citizens' groups concerned with the problem, and by various legislators who proposed plans specifically designed to avoid any possibility of impermissibly diluting black citizens' votes in these ways. The specific dilution problems presented by the black voter concentrations in the challenged districts in this litigation were known to and discussed in legislative deliberations.

The basic policy justification advanced by the state in this litigation for the legislature's declination to create single-member districts to avoid submerging concentrations of black voters in the challenged multi-member districts was the maintenance of an historical, functionally sound tradition of using whole counties as the irreversible "building blocks" of legislative districting. Although the state adduced fairly persuasive evidence that the "whole-county" policy was well-established historically, had legitimate functional pur-

poses, and was in its origins completely without racial implications, that all became largely irrelevant as matters developed in this particular legislative redistricting plan. At the time of its final enactment, the state policy—though compelled—was that counties *might* be split. When the Attorney General declined to give preclearance to the state constitutional prohibition of county divisions in redistricting, the state acquiesced and, indeed, divided counties thereafter both in non-covered as well as covered counties in the final redistricting plan. *See* note 3, *supra.* To the extent the policy thereafter was to split counties only when necessary to meet population deviation requirements or to obtain § 5 preclearance of particular districts—and this is what the record demonstrates—such a policy obviously could not be drawn upon to justify, under a fairness test, districting which results in racial vote dilution.

The same findings apply, though with added force, to Senate District No. 2. There, of course, in the final plan counties *were* split; indeed four were split in the face of a proposed plan which would have yielded an effective black-majority single-member district which only involved splitting two counties. Other policy considerations that were plainly shown to have influenced the legislature in its final drawing of Senate District No. 2 lines were the protection of incumbents and, in the words of one legislator-witness in this action, swallowing the "smallest of three pills" offered by the Justice Department in preclearance negotiations respecting the lowest permissible size of the black population concentration in the district. Obviously, neither of these policies could serve to outweigh a racial dilution result.

■ The final policy consideration suggested by the state is the avoidance of race-conscious gerrymandering. While there may be some final constitutional constraint here, *cf. Karcher v. Daggett,* —— U.S. ——, ——, 103 S.Ct. 2653, 2667, 77 L.Ed.2d 133 (1983) (Stevens, J., concurring), we find that it is not approached here by the available means of avoiding submer-

gence or fragmentation of any of the black voter concentrations at issue. The most serious problem is that posed by the configuration of the black voter concentration in House District No. 8, comprised of Wilson, Nash and Edgecombe Counties. The configuration of the single-member district specifically suggested by the plaintiffs as a viable one is obviously not a model of aesthetic tidiness. But given the evidence, not challenged by defendants, that in the present multi-member district the black population, 39.5% of the total, simply cannot hope ever to elect a candidate of its choice, aesthetics, as opposed to compactness and commonality of interests, cannot be accorded primacy. *See Carstens v. Lamm, supra; Skolnick v. State Electoral Board,* 336 F.Supp. 839, 843 (N.D.Ill. 1971) (three-judge court) (even compactness not a fundamental requirement).

### Ultimate Findings of Fact

■ 1. Considered in conjunction with the totality of relevant circumstances found by the court—the lingering effects of seventy years of official discrimination against black citizens in matters touching registration and voting, substantial to severe racial polarization in voting, the effects of thirty years of persistent racial appeals in political campaigns, a relatively depressed socio-economic status resulting in significant degree from a century of *de jure* and *de facto* segregation, and the continuing effect of a majority vote requirement—the creation of each of the multi-member districts challenged in this action results in the black registered voters of that district being submerged as a voting minority in the district and thereby having less opportunity than do other members of the electorate to participate in the political process and to elect representatives of their choice.

■ 2. Considered in conjunction with the same circumstances, the creation of single-member Senate District No. 2 results in the black registered voters in an area covered by Senate Districts Nos. 2 and 6 having their voting strength diluted by

fracturing their concentration into two districts in each of which they are a voting minority and in consequence have less opportunity than do other members of the electorate to participate in the political process and to elect representatives of their choice.[33]

## IV

## CONCLUSIONS OF LAW

1. The court has jurisdiction of the parties and of the subject matter of the action under 28 U.S.C. §§ 1331, 1343, and 42 U.S.C. § 1973c.

2. The court is properly convened as a three-judge court under 28 U.S.C. § 2284(a).

3. The action has been properly certified as a class action on behalf of all black residents of North Carolina who are registered to vote. No challenge is made to the

propriety of the class action under any of the criteria of the governing class action rule, Rule 23, Fed.R.Civ.P.

4. Of the challenged districts, only House District No. 8 (Wilson, Edgecombe and Nash) and Senate District No. 2 include counties that are covered under § 4(a) of the Voting Rights Act and for which preclearance is required under § 5 of that Act, 42 U.S.C. § 1973c.

■ The Attorney General's indication on April 27, 1982, that, so far as it affected covered counties, he would interpose no objection under § 5 to the legislative enactment of the redistricting plan which, *inter alia*, created House District No. 8 and Senate District No. 2 does not have the effect of precluding this claim by plaintiffs brought under amended § 2 to challenge the redistricting plan in respect of these

---

**33.** The state challenges the basic premise of this finding with the familiar argument that the relative merits of legislative division of a minority population that is not large enough to form voting majorities in two single-member districts into an effective voting majority in one single-member district and an ineffective minority in another or, on the other hand, dividing it into two substantially influential minorities in two districts is so problematical that neither the one nor the other division can properly be adjudged "dilutive" by a court. *See, e.g., Seamon v. Upham,* 536 F.Supp. 931, 949 (E.D.Tex.) (three-judge court) *rev'd on other grounds,* 456 U.S. 37, 102 S.Ct. 1518, 71 L.Ed.2d 725 (1982); *compare Jordan v. Winter,* 541 F.Supp. 1135, 1143 (N.D. Miss.1982) (three-judge court), *vacated and remanded for further consideration in light of amended § 2,* — U.S. ——, 103 S.Ct. 2077, 77 L.Ed.2d 291 (1983) (legislative preference unchallengeable) with *Kirksey v. Board of Supervisors,* 554 F.2d at 150 (dilution possible even if one of districts has bare black population majority). The specific argument here is that any increase in the present minority population of 55.1% in Senate District No. 2 will be at the expense of the present 49.3% black population in Senate District No. 6, the obvious source for District 2 increase.

We are not impressed with the argument. While the dilemma is a real one, we think it is one that Congress has, in effect, committed to the judgment of the black community to whom it has given the private right of action under amended § 2. The right created is, by definition, that of a "class" and the procedural means of vindicating it by a class action has also been

provided by Congress in Fed.R.Civ.P. 23. When, as here, such a class action is brought by a class which includes such a fragmented concentration of black voters, a group judgment about the group's best means of access to the political process must be assumed reflected in the specific claim made by the class. The legitimacy of that group judgment, from the standpoint of members of the class identified, can be put to test by standard procedures: by challenges to the adequacy of representation or the typicality of claims by any members of the identified class who question the wisdom or validity of the class claim under Rule 23(a)(3) & (4), Fed.R.Civ.P., or even by attempted intervention under Rule 24, Fed.R.Civ.P. When, as here, no such challenges are made, a dilution claim made by the class is properly assessed in the terms made, and on the understanding that any judgment entered on its basis will be binding on all members of the class who may not later second-guess it under ordinary principles of claim preclusion, *see* Restatement (Second) Judgments § 24, comments b, c; § 25 comments f, m; § 41(1)(e), (2), comment e, or, possibly, judicial estoppel, *see Allen v. Zurich Ins. Co.,* 667 F.2d 1162 (4th Cir.1982).

If this were not the approach taken, a foolproof means would be provided for irremediable fracturing of any such minority voter concentration. That cannot have been intended by Congress. A different situation of course would be presented if the class of black voters bringing such a dilution-by-fracturing claim included only the voters in one of the districts into which the fracturing had occurred. That is not this case.

two districts. 42 U.S.C. § 1973c; *Major v. Treen, supra,* at 327 n. 1; *United States v. East Baton Rouge Parish School Board,* 594 F.2d 56, 59 n. 9 (5th Cir.1979); *see also Morris v. Gressette,* 432 U.S. 491, 506–07, 97 S.Ct. 2411, 2421, 53 L.Ed.2d 506 (1977). Because the standards by which the Attorney General assesses voting changes under § 5 are different from those by which judicial claims under § 2 are to be assessed by the judiciary, *see* S.Rep. No. 97–417, *supra* note 10, at 68, 138–39, and because the former are applied in a non-adversarial administrative proceeding, the Attorney General's preclearance determination has no issue preclusive (collateral estoppel) effect in this action. *See* Restatement (Second) Judgments §§ 27 comment c; 83(2) & (3) (1980).

5. The meaning and intended application of amended § 2 of the Voting Rights Act in relation to the claims at issue in this action are as stated in Part II of this Memorandum Opinion.

6. On the basis of this court's ultimate findings of fact, the plaintiffs have established that the creation by the General Assembly of North Carolina of multi-member House Districts Nos. 8, 21, 23, 36 and 39, multi-member Senate District No. 22, and single-member Senate District No. 2 will, as applied, result in an abridgement of their voting rights, as members of a class protected by subsection (a) of amended § 2 of the Voting Rights Act, in violation of that section.

7. The plaintiffs are entitled to appropriate relief from the violation.

## V

### REMEDY

Having determined that the state's redistricting plans, in the respects challenged, are not in compliance with the mandate of amended § 2 of the Voting Rights Act, the court will enter an order declaring the redistricting plan violative of § 2 in those respects, and enjoining the defendants from conducting elections pursuant to the plan in its present form.

In deference to the primary jurisdiction of state legislatures over legislative reapportionment, *White v. Weiser,* 412 U.S. 783, 795, 93 S.Ct. 2348, 2354, 37 L.Ed.2d 335 (1973), we will defer further action to allow the General Assembly of North Carolina an opportunity to exercise that jurisdiction in an effort to comply with § 2 in the respects required. This is especially appropriate where, as here, the General Assembly adopted the plan found violative of § 2 before the enactment of the amended version of that statute which now applies, and where there has accordingly been no previous legislative opportunity to assess the amended statute's substantial new requirements for affirmatively avoiding racial vote dilution rather than merely avoiding its intentional imposition.

Having determined that the present plan violates a secured voting right, our obligation remains, however, to provide affirmative judicial relief if needed to insure compliance by the state with its duty to construct districts that do not dilute the voting strength of the plaintiff class in the ways here found, or in other ways. *See In re: Illinois Congressional Districts Reapportionment Cases,* No. 81 C 1395, slip op. (N.D.Ill.1981), *aff'd mem. sub nom., Ryan v. Otto,* 454 U.S. 1130, 102 S.Ct. 985, 71 L.Ed.2d 284 (1982); *Rybicki v. State Board of Elections,* 574 F.Supp. 1082 (N.D.Ill. 1982); *Kirksey v. Board of Supervisors,* 554 F.2d 139 (5th Cir.), *cert. denied,* 434 U.S. 968, 98 S.Ct. 512, 54 L.Ed.2d 454 (1977).

Recognizing the difficulties posed for the state by the imminence of 1984 primary elections, the court will convene at any time, upon request of the state, to consider and promptly to rule upon any redistricting plan that has been enacted by the State in an effort to comply with the mandates of § 2 and with this decision. Failing legislative action having that effect within a reasonable time under the circumstances, not later than March 16, 1984, the court will discharge its obligation to develop and implement an appropriate remedial plan.

An appropriate order will issue.

## SUPPLEMENTAL OPINION

On January 27, 1984, this court enjoined certain elections under the 1982 legislative redistricting plan for election of members of the North Carolina Senate and House of Representatives, declaring the plan violative of section 2 of the Voting Rights Act of 1965, 42 U.S.C. § 1973. Specifically, the court held that, in five House districts and in two Senate districts, the plan diluted the voting strength of black citizens either by submerging or by fracturing concentrations of black voters sufficient in numbers and contiguity to constitute effective voting majorities in appropriately drawn districts. The court's order enjoined defendants from holding any legislative elections that would affect black registered voters in the challenged districts and allowed the General Assembly until March 16, 1984, to submit for the court's approval a duly-enacted redistricting plan remedying the specific violations found.

On March 8, 1984, the General Assembly responded to the court's order by enacting, in the form of six bills, a redistricting plan drawing new district lines affecting each of the originally-challenged districts and, by motion on March 12, 1984, submitted this plan to the court for approval. Contemporaneously, the state submitted the plan for consideration by the Attorney General of the United States insofar as it affected voters in areas of the state covered by § 5 of the Voting Rights Act.

On March 15, 1984, the plaintiffs submitted a Preliminary Response objecting to the plan and proposing certain modifications to the plan's redistricting of the areas covered by former House Districts 8 and 36. Concurrently, the plaintiffs moved the court for leave to take depositions of the state legislators and legislative staff members directly involved in developing the enacted plan, and requested an evidentiary hearing on the issue of the remedial adequacy of the state's proposed plan. On March 19, 1984, we denied the plaintiffs' motion and their request for a hearing, determining to decide the question of legislative compliance on the record as then made.

### I

The plan presented to the court for approval changes in the following material respects the district lines in all of the districts challenged at trial:

1. *Former House District No. 8.*

Former House District No. 8 was a four-member district comprised of all of Wilson, Edgecombe and Nash Counties. Blacks comprised 39.5% of its total population. The plan divides this area into House District No. 70 and House District No. 8. District No. 70 runs roughly north-south through the center of the former district, while District No. 8 occupies the balance of the three-county area, enclosing District 70 on three sides. Black citizens in Districts 70 and 8 comprise the following percentages of the total populations:

| | |
|---|---|
| HD 8 | 29.6% |
| HD 70 | 69.1% |

2. *Former House District 23.*

Former House District No. 23 was a three-member district containing all of Durham County. Blacks comprised 36.3% of its total population. The plan divides Durham County into three single-member districts having the following black citizen population percentages:

| | |
|---|---|
| HD 23 | 67.2% |
| HD 68 | 31.0% |
| HD 69 | 10.9% |

3. *Former House District 21.*

Former House District 21 was a six-member district containing all of Wake County. Blacks comprised 21.8% of its total population. The plan divides the county into six single-member districts with the following black citizen population percentages:

| | |
|---|---|
| HD 21 | 63.4% |
| HD 61 | 6.5% |
| HD 62 | 21.3% |
| HD 63 | 9.5% |

| | | | |
|---|---|---|---|
| HD 64 | 12.1% | SD 34 | 14.4% |
| HD 65 | 18.1% | SD 35 | 5.8% |

#### 4. *Former House District No. 36.*

Former House District 36 was an eight-member district comprised of all of Mecklenburg County. Blacks comprised 26.5% of its total population. The plan divides this area into eight single-member districts with the following black citizen population percentages:

| | |
|---|---|
| HD 36 | 4.5% |
| HD 54 | 16.9% |
| HD 55 | 12.1% |
| HD 56 | 18.0% |
| HD 57 | 2.1% |
| HD 58 | 28.2% |
| HD 59 | 63.1% |
| HD 60 | 66.3% |

Blacks citizens constitute 57.4% and 68.5% of the registered voters in Districts 59 and 60 respectively.

#### 5. *Former House District 39.*

Former House District 39 was a five-member district containing almost all of Forsyth County. Blacks comprised 25.1% of its total population. The plan divides this area between House Districts 66 and 67, both single-member districts, and House District 39, a three-member district. These districts have the following black citizen population percentages:

| | |
|---|---|
| HD 39 | 4.4% |
| HD 66 | 56.1% |
| HD 67 | 55.4% |

Black citizens comprise 56.4% and 53.8% of the registered voters of HD 66 and 67 respectively.

#### 6. *Former Senate District 22.*

Former Senate District 22 was a four-member district comprised of all of Mecklenburg and Cabarrus Counties. Blacks comprised 24.3% of its total population. The plan divides this area into four single-member districts having the following black citizen population percentages:

| | |
|---|---|
| SD 22 | 11.1% |
| SD 33 | 66.0% |

62.6% of the registered voters in SD 33 are black.

#### 7. *Former Senate District 2.*

Former Senate District 2, a single-member district, occupied a large area in the northeast section of the state. Blacks comprised 55.1% of its total population and 46.2% of its registered voters. By redrawing the district lines of former Senate Districts 1, 2, 6, 9, 10, 11 and 14, the plan established new Senate District 2 in which blacks constitute 60.7% of the total population.

With the matter now before us on defendants' motion and plaintiffs' response, we have determined to decide the issue of the submitted plan's remedial adequacy to the extent we may at this time. Our decision may only run to those aspects of the plan that do not affect areas of the state covered by section 5 of the Voting Rights Act, because at this time the plan is still under consideration, insofar as it affects covered areas, by the Attorney General of the United States. In that situation, our power is so limited. *See McDaniel v. Sanchez*, 452 U.S. 130, 101 S.Ct. 2224, 68 L.Ed.2d 724 (1981).

While we are somewhat reluctant to fragment our consideration and decision on the adequacy of the submitted plan we believe that in the interest of all concerned this is the proper course. Our reasons, briefly put, are as follows:

Among the features of the legislative plan submitted to this court is a revised schedule for the conduct of primary elections which provides alternative dates depending upon the date upon which approval for holding elections in particular districts may be received from "a court of competent jurisdiction." The first such date is June 5, 1984, which is to be used if court approval is received by 5:00 p.m. on April 20, 1984. The next date is July 17, 1984, which is to be used if approval is received after April 21 but before 5:00 p.m. on May 17, 1984.

Obviously, the interests of all parties and of the public will be best served by allowing primary elections to be held at the earliest practicable dates consistent with the plaintiffs' rights as established in this action. The alternative dates provided in the legislative plan are not challenged for fairness by the plaintiffs, and we find them valid features of the general remedial plan.

No reason appears why approval should not now be given to hold elections in accordance with the state's schedule in those districts to which our power of approval presently extends and as to which we find approval warranted. It is not possible at this time to know when preclearance or objection by the Attorney General with respect to covered areas within the plan will be forthcoming. To allow elections to proceed at the earliest of the alternative dates provided in the state's plan, we must act at this time.

For the foregoing reasons, and for reasons that follow, we now determine that the legislative plan under submission adequately remedies the violations found by this court in respect of all those areas of the state not covered by section 5, and we therefore approve the plan to that extent. Because of the specific objections raised by plaintiffs to some features of the plan, we explain the basis for the approval we give.

Of the new districts in this plan, HD's 8 and 70 (formerly HD 8) and SD 2 (reconstituted from portions of former SD's 1, 2, 6, 9, 10, 11 and 14) lie within areas of the state covered by § 5 of the Voting Rights Act. Our ensuing discussion and approval therefore does not run to any of those districts, nor to the specific objections of plaintiffs to any of them.

## II

Although they do not concede the plan's validity in other respects, the plaintiffs have objected specifically to the proposed plan's redistricting of the area covered by former House District 36, that is, the Mecklenburg district. Their contention, briefly summarized, is that in respect of that area the defendants have failed to meet their burden of showing that the plan has neither the purpose nor the effect of diluting black minority voting strength, and that it therefore adequately remedies the § 2 violations found.

In support of this contention, plaintiffs point to the following characteristics of the plan in that area. First, although containing the maximum possible number of districts in which blacks could constitute an effective voting majority, the plan fractures substantial black population concentrations which, though insufficient in numbers and contiguity to constitute another voting majority, might nonetheless exercise considerable voting power as a substantial voting minority in one at least of appropriately constructed single-member districts. Second, the plan contains districts so irregularly shaped that voters assertedly will not be able to learn in which district they live so as to be able to use their votes effectively. According to plaintiffs, since defendants can offer no justifying policy for these irregularities, apart from the desire to protect incumbents, they have not met their burden of showing that the plan is free from any discriminatory purpose or effect, and is thus adequate fully to remedy the violations earlier found.

In part to buttress this argument, plaintiffs have submitted their own proposed redistricting plan for this area. Their plan, in contrast to that of the defendants, divides Mecklenburg County into eight single-member districts having the following black citizen population percentages:

| Plaintiffs' Proposed House District | % Black |
|---|---|
| District 36 | 64.2% |
| District 54 | 65.6% |
| District 55 | 44.7% |
| District 56 | 11.6% |
| District 57 | 4.7% |
| District 58 | 1.6% |
| District 59 | 4.3% |
| District 60 | 14.2% |

This alternative to the state's plan has two salient characteristics. First, it contains districts which, on the whole, are significantly more regular in shape than are their counterparts in the state's plan. Sec-

ond, the plaintiffs' plan, although containing the same number of single-member districts in which black citizens comprise effective voting majorities, also contains one other single-member district in which the black population approaches, but does not reach, a majority.[1] By contrast, in none of the white-majority districts under the state's plan does black population percentage exceed 30%.[2]

### III

We conclude that plaintiffs' objections neither require nor justify our refusal to approve, to the extent noted, the state's plan as submitted, and that on the record before us no other basis appears for refusing that approval.

We start by observing of the state's plan that it indisputably remedies each of the specific violations found in the originally challenged plan, including those in the areas to which specific objection is now made by plaintiffs. That is to say, the plan now submitted does not, as did the originally challenged plan, dilute, either by "submergence" or by "fracture," any concentration of black voters sufficient in numbers and contiguity to constitute an effective voting majority in an otherwise constitutionally constructed single-member district. We do not understand plaintiffs to challenge this proposition. We therefore conclude initially that in exercise of its primary jurisdiction responsive to this court's order, the state has now effectively remedied the racial vote dilution violations originally charged by plaintiffs and found by this court in respect of all areas not covered by section 5.

Plaintiffs' present challenge to the remedial plan, as we understand it, focuses on that plan's "result" upon the voting strength of those registered black voters who, at least in one of the originally challenged redistricting areas, are left out of

(or left over from) the remedially created black majority single-member districts. As we understand plaintiffs' objections, they must be based upon either or both of two intertwined factual/legal theories.

The first theory seems to be that racial vote dilution, in the *White v. Register/Voting Rights Act* constitutional and statutory sense, may be found not only with respect to aggregations of black voters large enough to make up effective voting majorities in single-member districts, but with respect to smaller aggregations as well; and that dilution in that sense now results from the state's plan with respect to those aggregations of black voters outside the remedially created single-member districts.

The second theory, less clear, is apparently that equitable considerations may in any event require that a state redistricting plan adopted to remedy judicially found dilution by submergence (or fracturing) of effective voting majorities must not only remedy the specific violation found but also maximize (or at least not significantly diminish) the voting strength of those black voters outside remedially drawn single-member districts; and that the state's plan here fails in this respect.

So far as we can tell, neither of these factual/legal theories has been definitively addressed—though intimations may be found—in extant racial vote dilution jurisprudence. Certainly neither is directly addressed in the text of amended section 2 of the Voting Rights Act, nor, except perhaps tangentially, in the Act's legislative history. Because in the two respects now specifically challenged the state's plan might be thought questionable under either or both of these theories, we think it necessary to address them head-on.

As to whether the general concept of racial vote dilution can properly be applied under any circumstances to smaller aggre-

---

**1.** This "packed" district, No. 55, would contain a black population of 44.7%.

**2.** Under the state's plan black citizens comprise 28.2% of the population in HD 58, the largest black concentration outside the safe districts.

Of course, "packing" one additional district to achieve substantial black minorities in the challenged area would be at the expense of the black minorities in the other white-majority districts.

gations of black voters than those sufficient to make up effective single-member district voting majorities we reserve decision, but we think it at least doubtful. Because the basis for our doubt bears critically upon our consideration of the further questions whether a state's judicially ordered remedial plan must in any event maximize the voting strength of any such smaller aggregations within its general reach, we briefly outline the basis of our doubt.

There is, first off, the fact that the principle cases authoritatively developing the vote dilution concept have involved the impact of districting upon effective voting majorities. *See, e.g., Rogers v. Lodge,* 458 U.S. 613, 102 S.Ct. 3272, 73 L.Ed.2d 1012 (1982); *Mobile v. Bolden,* 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980); *White v. Regester,* 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973). Confined to such measurable[3] aggregations, the concept has a principled basis which permits rational and consistent, albeit sometimes difficult, application; not so confined, it lacks any such basis. That is to say, at the effective voting majority level it is possible to say with substantial assurance that to submerge or fracture such an aggregation in a racially polarized voting situation effectively deprives it of the presumptive capability to elect, solely by its group voting strength, representatives "of its choice." *See Nevitt v. Sides,* 571 F.2d 209, 216 (5th Cir.1978) (submergence); *Kirksey v. Board of Supervisors,* 554 F.2d 139 (5th Cir.1977) (fracturing). The raw power of such an aggregation "to elect" provides a clear measure of its voting strength, hence a fair and workable standard by which to measure dilution of that strength. Short of that level, there is no such principled basis for gauging voting strength, hence dilution of that strength. Nothing but raw intuition could be drawn upon by courts to determine in the first place the size of those smaller aggregations having sufficient group voting strength to be capable of dilution in any legally meaningful sense and, beyond that, to give some substantive content other than raw-power-to-elect to the concept as applied to such aggregations.

We are doubtful that either the Supreme Court in developing the dilution concept in constitutional voting rights litigation, or the Congress in embodying it in amended section 2 of the Voting Rights Act intended an application open-ended as to voter group size. There must obviously be some size (as well as dispersion) limits on those aggregations of voters to whom the concept can properly be applied. We do not readily perceive the limit short of the effective voting majority level that can rationally be drawn and applied.[4]

For that reason, were the present objections being made to an original legislative districting plan on the basis that it diluted the voting strength of such smaller aggregations of black voters, we would be disposed to reject it on the basis that the concept could not properly be applied in that context.

But here, of course, the challenge is not to such an original plan but to a remedial one which had concededly done all that may be done to remedy the violations originally found, the dilution of effective voting majority aggregations. The gist of the challenge is that once a vote dilution viola-

---

3. This is not to suggest that "effective voting majority" is an easily defined or measured voting entity; in our original opinion, we conceded that it is not. *Gingles v. Edmisten,* 590 F.Supp. 345 at 358 n. 21 (E.D.N.C.1984) (three-judge court). But it does have a specific low-side limit that provides a measurable reference point: no aggregation of less than 50% of an area's voting age population can possibly constitute an effective voting majority. The difficulty comes only in deciding how much larger than 50% must be the aggregation. *See, id.*

4. Though the constitutionality of amended section 2 is not challenged in this action, it is nevertheless appropriate to observe that the rationality of its interpretation and application in this respect might determine its constitutionality. Under familiar principles of statutory construction, this militates against any construction of the statute that would allow open-ended application of the embodied dilution concept so far as voter group size is concerned. *See Lynch v. Overholser,* 369 U.S. 705, 710–11, 82 S.Ct. 1063, 1067, 8 L.Ed.2d 211 (1962).

tion has been judicially found, a legislative remedial plan must go beyond rectification of the specific violation found and maximize (or at least not intentionally minimize) that of residual aggregations of black voters as well.

▮ We assume that in an appropriate case a court in assessing a legislature's remedial plan designed to remedy section 2 dilution violations might properly invoke equitable considerations to reject a plan that did no more than provide the maximum possible number of "safe" black-majority, single-member districts in the relevant area. *See Whitcomb v. Chavis*, 403 U.S. 124, 161, 91 S.Ct. 1858, 1878, 29 L.Ed.2d 363 (1971). But we take it that this does not require, nor permit, the rejection of a legislative plan simply because the reviewing court would have adopted another thought to provide a better, more equitable overall remedy for the originally found racial vote dilution. Such a principle of judicial deference clearly applies in respect of legislative reapportionment plans enacted to remedy constitutional violations of one-person-one-vote principles, *see White v. Weiser*, 412 U.S. 783, 794–97, 93 S.Ct. 2348, 2354–55, 37 L.Ed.2d 335 (1972). We see no reason why the same principle should not apply to legislative plans enacted to remedy racial vote dilution found violative of amended section 2 of the Voting Rights Act. In the latter context, as in the former, a state legislature's primary jurisdiction for legislative apportionment and redistricting must include the right, free of judicial rejection, to implement state policies that may fail to remedy to the fullest extent possible the voting rights violations originally found, just so long as the remedial plan does not inflict new violations of those rights. *See White v. Weiser*, 412 U.S. 783, 795, 93 S.Ct. 2348, 2354, 37 L.Ed.2d 335 (1973).

Here, we are frank to say that were we exercising primary jurisdiction to remedy the specific violations originally found in the area of original House District 36, we might well have adopted a plan more comparable to that proposed by plaintiffs than to that now submitted by the state. *See, e.g., Chapman v. Meier*, 420 U.S. 1, 95 S.Ct. 751, 42 L.Ed.2d 766 (1975); *Connor v. Williams*, 404 U.S. 549, 92 S.Ct. 656, 30 L.Ed.2d 704 (1972); *East Carroll Parish School Board v. Marshall*, 424 U.S. 636, 639, 96 S.Ct. 1083, 1085, 47 L.Ed.2d 296 (1976). We may assume, *arguendo*, that, as plaintiffs contend, the state's plan in this area probably represents no more than a grudging minimal response to the remedial necessities faced by the legislature. Certainly there is no manifestation in the plan itself of any affirmative effort to do more. We may also assume, as plaintiffs suggest, that the state's plan reflects a primary concern to protect incumbents that prevailed over any concern to enhance black voting strength outside the safe single-member districts or to insure compactness and cohesion in drawing district lines.

Be all that as it may, we cannot say of the challenged portions of the state's plan that they so seriously and demonstrably impinge upon the voting strength of the residual aggregations of black voters in the affected areas that the plan violates anew the voting rights of those persons.

▮ The protection of incumbents, even though demonstrably a more dominant concern in the minds of the enactors of the state's plan than enhancing residual black voter strength, does not *per se* require judicial rejection of the state plan. *See Weiser*, 412 U.S. at 797, 93 S.Ct. at 2355.

While the district lines were obviously not drawn to insure maximum compactness and cohesion of the new districts in the remedial plan, their configurations do not approach the obvious gerrymandering that might raise constitutional questions on that score alone. *See Gomillion v. Lightfoot*, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960); *Karcher v. Daggett*, 462 U.S. 725, ——, 103 S.Ct. 2653, 2667, 77 L.Ed.2d 133 (1983) (Stevens, J., concurring).

This leaves the question whether the state's failure to create in the disputed area a single-member district with a substantial black population minority (as opposed to spreading the residual black populations in

increments not greater than 30% among a number of single-member districts) requires or justifies disapproval of the plan. The question, in other words, is whether equitable considerations require that, having been found in violation of the Voting Rights Act by dilution of black voting strength through the submergence of effective black voting majorities, the state must be held not only to remedying that specific violation but also to maximizing in this way the voting strength of these residual aggregations of black voters.

We can assume, for present purposes, that even if the vote dilution concept could not properly be applied to such smaller aggregations of voters in an original challenge to legislative districting, equitable considerations might nevertheless sometimes justify a court's requiring a state to enhance the voting strength of such a residual aggregation beyond that proposed in its remedial plan. But we are satisfied that this could only be proper where, all other considerations aside, a court could determine with assurance that its imposed plan would indeed significantly enhance the voting strength of the residual group above that resulting from the state's plan. Only on the basis of that sort of assurance could a court be justified in displacing state policies in order to vindicate federally secured voting rights. There may be such situations, but we cannot with sufficient assurance find it here.

As earlier noted, gauging the voting strength of less-than-majority population groups—either absolutely or relatively—is a difficult and uncertain business at best. When a racial group's numbers are not sufficient to give it the raw power—as a matter of sheer mathematics—to win elections, its "voting strength" as otherwise manifested is dependent on such a variety of factors as to defy fair and confident measurement.

Concededly, numbers may still be the prime voting strength factor even with respect to population minorities. Generally it can be assumed that a cohesive 45% population minority in district X will have greater voting strength than would a cohesive 30% population minority in district Y. But this, of course, is not necessarily true. It depends, among other things, upon the philosohical-political make-up of the population majorities in the districts. Dependent upon that factor alone, the 30% population minority may in fact have greater voting strength than does the 45%. Such non-mathematical factors are quintessentially political in nature, the kind whose assessment is most treacherous for courts of law and most appropriate for the legislative process. *See Mobile v. Bolden,* 446 U.S. 55, 93 & n. 15, 100 S.Ct. 1490, 1513 & n. 15, 64 L.Ed.2d 47 (1980) (Stevens, J., concurring in the judgment).

Here, for example, we might sense intuitively that the overall voting strength of the residual black voter group in former House District 36 would be enhanced by districting that packed one district to near-majority black population status while cutting back still further the black minorities in the other five white-majority districts under both plaintiff and state plans. But this would only be intuition, and dubious intuition at that.

In fact, we have no idea of the practical interaction between the demonstrably severe racial polarization in voting patterns in the affected areas and a near-majority status for the black minority in such a "packed" district. Intuitively, again, we might suspect, if anything, a hardening of the already severe polarization patterns in such a now more seriously "threatened" district. Nor do we have any idea of the philosophical-political compositions of the white majorities in the various white-majority districts as proposed by plaintiffs, a factor that obviously bears critically upon the potential for black-white political alliances, hence black voting strength, in those districts. *Cf. Upham v. Seamon,* 456 U.S. 37, 102 S.Ct. 1518, 71 L.Ed.2d 725 (1982).

The required assurance cannot be supplied by the fact that the directly affected groups of black voters, acting through their class action representatives, seek imposition of the plaintiffs' packed district

plan. In our original opinion we pointed out that such a formally expressed group judgment in a class action sufficed as answer to a state's defense of the fracturing of an effective black voting majority into two substantial black population minority districts. In that context the state's defense of its districting plan was that fracturing in that way did not so assuredly diminish overall black voting strength beyond that which would have been possessed by one majority black district and one ineffectual minority black district as to justify a finding of vote dilution. There, however, it was possible to say, as it is not here, that the fracturing would assuredly deny to one element within the group the raw power, potentially possessed, to elect a representative of its choice. *See Gingles v. Edmisten*, 375 F.Supp. 590 at 345 n. 33 (E.D.N.C.1984).

Here, we have no independent assurance that the proferred compromise of interests within the residual group of black voters would significantly enhance the group's voting strength above that resulting from the state plan. Imposition of the proferred plan might therefore be a vain exercise, and a court exercising equity powers should no more engage in potentially vain exercises in this context than others.

Obviously the plaintiff class may not simply be given effective veto power over any remedial plan submitted, as would be done were we simply to defer to its group judgment on the matter at issue.

## IV

For the reasons expressed, we reject plaintiffs' specific objections to the state's remedial plan as it affects the area included within former HD 36, and upon general consideration of the plan as it affects that and all other areas not covered by section 5 of the Voting Rights Act, we approve the plan insofar as it creates new SD's 22, 33, 34, 35 (Mecklenburg/Cabarrus); new HD's 23, 68, 69 (Durham); new HD's 21, 61, 62, 63, 64, 65 (Wake); new HD's 36, 54, 55, 56, 57, 58, 59, 60 (Mecklenburg); and new HD's 39, 66, and 67 (Forsyth); and insofar as it re-schedules dates for primary elections.

An appropriate order will be entered.

## ORDER

This matter is before the court on defendants' motion to approve the legislative redistricting plan adopted by the General Assembly of North Carolina on March 8, 1984, responsive to this court's order of January 19, 1984, and plaintiffs' response to the motion;

Upon consideration of the motion papers and the record, and in accordance with the Supplemental Opinion of the court filed this day, it is ADJUDGED and ORDERED that:

1. The legislative redistricting plan submitted by defendants on March 12, 1984, for consideration by this court is APPROVED insofar as it redistricts former House Districts 21, 23, 36 and 39 by Chap. 6, House Bill 1, Extra Session 1984; insofar as it redistricts former Senate District 22 by Chap. 4, Senate Bill 2, Extra Session 1984; and insofar as it provides for the holding of primary elections in the resulting districts by Chap. 2, House Bill 3, Extra Session 1984.

2. The injunction entered by this court in its order of January 19, 1984, is DISSOLVED insofar as it applied to the conduct of elections within the various districts resulting from those portions of the redistricting plan approved in paragraph 1 of this order, *viz:* Senate Districts 22, 33, 34 and 35 (Mecklenburg and Cabarrus Counties); House Districts 36, 54, 55, 56, 57, 58, 59 and 60 (Mecklenburg County); House Districts 21, 61, 62, 63, 64 and 65 (Wake County); House Districts 39, 66 and 67 (part of Forsyth County); House Districts 23, 68 and 69 (Durham County).

3. Jurisdiction is retained in this court for such further proceedings as may be required.

With the concurrence of Judge Britt and Judge Dupree.